# EXHIBIT "A"

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

| | |
|---|---|
| INTEGON NATIONAL INSURANCE COMPANY ] | |
| ] | |
| Plaintiff ] | |
| ] | |
| vs. ] | |
| ] | |
| PALWINDER SINGH ] | Case No.:2021-00641 |
| 817 Walker Road ] | |
| Great Falls, VA 22066-2610 ] | |
| ] | |
| and ] | |
| ] | |
| WILMINGTON TRUST, NATIONAL ASSOCIATION, ] | |
| Not in its individual capacity, but solely as Trustee ] | |
| for MFRA Trust 2014-2 ] | |
| 350 Park Avenue, 20th Floor ] | |
| New York, NY 10022 ] | |
| ] | |
| Serve: Secretary of the Commonwealth ] | |
| 1111 East Broad Street, 4th Floor ] | |
| Richmond, Virginia 23219 ] | |

## AMENDED COMPLAINT OF INTEGON NATIONAL INSURANCE COMPANY FOR DECLARATORY JUDGMENT

Plaintiff Integon National Insurance Company ("Integon") seeks a declaratory judgment against Defendants as follows:

## PARTIES

1.    Integon is a homeowners insurance carrier that, upon application by Palwinder Singh, issued Virginia Homeowner's Insurance Policy, No. 205979640 ("the Policy") for 817 Walker Road, Great Falls, Virginia 22066-2610 on January 3, 2018. (See Exhibit A). The Policy was renewed on January 3, 2019 and January 3, 2020 for one-year periods.

2.    Palwinder Singh is a resident of Fairfax County, Virginia and was the Named Insured under the Policy.

3.   Palwinder Singh originally had a mortgage on 817 Walker Road, Great Falls, Virginia 22066-2610 with Bank of America, N.A., which was serviced by Faye Servicing LLC. (See Exhibit B). This mortgage was assigned to on October 17, 2017 to WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2 . (See Exhibit H). Wilmington Trust, NA is a foreign corporation.

4.   Fay Servicing, LLC is the agent regarding this mortgage for WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2 .

## CLAIM FACTS

5.   Palwinder Singh purchased 817 Walker Road, Great Falls, Virginia 22066-2610 on March 25, 2008. (See Exhibit C).

6.   On December 1, 2015, Palwinder Singh transferred all ownership of 817 Walker Road, Great Falls, Virginia 22066-2610 to Palsata Trust. (See Exhibit D).

7.   On or about January 3, 2018, Palwinder Singh made an oral application for the Policy.  (See Exhibit E).

8.   In the application, Palwinder Singh was asked:

     Q:    All right. Have you, have you ever had a foreclosure, repossession, judgment lien or bankruptcy in the last five years?

     A:    No.

and,

     Q:    All right. Have you ever had your insurance canceled, declined, or non-renewed?

     A:    No.

and,

Q.     All right. Have you ever owned a home or condo that was not insured in the past or present?

A:     No.

(Exhibit E, lines 120-127, 180-183).

8.     Integon reasonably relied on the representations in the Application that Palwinder Singh:

a.     had not filed for bankruptcy in the past 5 years; and
b.     had never had insurance policies cancelled; and
c.     never owned a home that was not insured.

9.     As a result, Integon rated the risk of issuing the Policy and, having decided to accept the risk and issue the policy, charged a premium based upon the information revealed in the Application.

10.    On January 3, 2018, Integon issued the Policy for the period of January 3, 2018 to January 3, 2019. The Policy was renewed on January 3, 2019 and January 3, 2020 for one-year periods.

11.    On April 1, 2019, Palsata Trust transferred 20% of the ownership of 817 Walker Road, Great Falls, Virginia 22066-2610 to Ajay Singh. (See Exhibit F).

12.    WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2, knew that Palsata Trust transferred 20% of the ownership of 817 Walker Road, Great Falls, Virginia 22066-2610 to Ajay Singh.

13.    On May 12, 2020, the property at 817 Walker Road, Great Falls, Virginia 22066-2610 was damaged by fire.

14.    Palwinder Singh had a clear and unambiguous duty to reveal all facts material to the risk to be assumed by Integon if the fact would reasonably influence Integon's decision whether or not to issue a policy or would have the effect of increasing the chances of the loss insured against, so as to bring about a rejection of the risk or charging an increased premium.

15.   Palwinder Singh materially misrepresented and failed to disclose the fact that he had filed for bankruptcy in the past 5 years. (See Exhibit G).

16.   Palwinder Singh materially misrepresented and failed to disclose the fact that he had insurance policies cancelled.

17.   Palwinder Singh materially misrepresented and failed to disclose the fact that he had owned a home that was not insured.

18.   Virginia law regarding misrepresentations in applications for insurance justifying rescission of the policy by the insurer is codified at Va. Code §38.2-309, which states, as follows:

**All statements, declarations and descriptions in any application for an insurance policy or for the reinstatement of an insurance policy shall be deemed representations and not warranties. No statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance unless it is clearly proved that such an answer or statement was material to the risk when assumed and was untrue.**

19.   The representations made in the Application were material to the risk when assumed and were untrue.

20.   Had Integon been told the truth regarding the facts that Palwinder Singh had declared bankruptcy within 5 years of the application, or that he had insurance policies previously cancelled, or that he had owned homes that were not insured; it either would not have issued the policy or would have charged a substantially increased premium, due to the increased risk.

21.   As a direct result of Palwinder Singh's material misrepresentations to Integon, Integon is entitled to rescind the Policy *ab initio* and declare it null and void.

22    Integon seeks a declaration of this Court, pursuant to Va. Code §8.01-184, that Integon may rescind and void *ab initio* the Policy, based on the material misrepresentations made by Palwinder Singh when he applied for the Policy in 2018.

## COUNT I–DECLARATORY RELIEF–Rescission

23.  Integon incorporates and re-alleges Paragraphs 1 through 22 as if stated herein.

24.  Integon asserts that it is entitled to void the Policy *ab initio* based upon Palwinder Singh's material misrepresentations.

25.  An actual controversy therefore exists between the parties as to whether there is any coverage for Palwinder Singh under the Policy.

26.  WHEREFORE Integon asks that this Court:

   a.  Declare that the Policy is void *ab initio,* that Integon is entitled to rescind the Policy and that Integon does not owe any coverage whatsoever as a result of the accident described in the tort suit;

   b.  Award it costs; and

   c.  Award and provide Integon with such other relief as this Court deems proper.

## COUNT II–DECLARATORY RELIEF–MORTGAGE CLAUSE

27.  Integon incorporates and re-alleges Paragraphs 1 through 26 as if stated herein.

28.  The Policy contains a "Mortgage Clause" which reads in pertinent part:

   K.   Mortgage Clause

   The word "mortgagee" includes trustee.

   1.   If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

   2.   If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

      a.   Notifies us of any change in ownership, occupancy or substantial change in risk which the mortgagee is aware;

(Exhibit A).

29. WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2, has made a claim for coverage of this loss.

30. Integon asserts that it does not owe coverage to WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2 under the Mortgage Clause based upon its failure to notify Integon of the change in ownership of 817 Walker Road, Great Falls, Virginia 22066-2610 on April 1, 2019.

31. An actual controversy therefore exists between the parties as to whether there is any coverage for WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2 under the Policy's Mortgage Clause.

32. WHEREFORE Integon asks that this Court:

    a. Declare that WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2 failed to notify Integon of a change in ownership of which it was aware; and

    b. that WILMINGTON TRUST, NATIONAL ASSOCIATION, Not in its individual capacity, but solely as Trustee for MFRA Trust 2014-2 is not entitled to coverage or payment under the Mortgage Clause of the Policy; and

    b. Award it costs; and

    c. Award and provide Integon with such other relief as this Court deems proper.

Respectfully submitted,

_____
Steven M. Levine, Esq. (#36787)
Michael J. Carita, Esq. (#35702)
LEVINECARITA PLC
1010 Cameron Street
Alexandria, VA 22314
Tel. 703-370-5569
Fax. 703-370-5572
Counsel for Integon National Insurance Company

Dated:  March 19, 2021



National General »
Auto, Home & Health Insurance
PO Box 3199 • Winston Salem, NC 27102-3199

Palwinder Singh
817 Walker Rd
Great Falls, VA 22066-2610

| | |
|---|---|
| Policy Number: | |
| **2005979640** | |
| Named Insured: | |
| **Palwinder Singh** | |
| **pvirk100@gmail.com** | |
| Policy Period: | **12:01 AM** |
| **1/3/2018 - 1/3/2019** | |
| Date of Notice: | 1/3/2018 |
| Policy Underwritten By: | |
| **Integon National Insurance Company** | |

**24 Hour Claim Reporting: 1-800-468-3466**
**For Policy Information: (800) 542-6792**
**www.MyNatGenPolicy.com**

9303257
Progressive Specialty Insurance Agency Inc.
PO Box 3199
Winston-Salem NC 27102-3199
(800) 542-6792

**Residence Premises**
817 Walker Rd
Great Falls, VA 22066-2610

## ONECHOICE HOMEOWNERS POLICY DECLARATIONS

**TRANSACTION TYPE:**
NEW BUSINESS

**PAYMENT TYPE:**
DIRECT BILL - 10-PAY

Dear Policyholder,

PROGRESSIVE SPECIALTY INSURANCE AGENCY INC. and National General Insurance are pleased to present you with your homeowners new business insurance policy.

A bill for your premium is being sent to you separately advising you of the minimum payment due and the premium due date. A deposit of $431.32 has been credited to your account.

In the event of a loss, call our toll free number 1-800-468-3466 for 24-hour claim reporting. Our dedicated professionals are ready to help 24 hours a day, seven days a week.

Thank you for letting us be of service and if you have any questions, please contact PROGRESSIVE SPECIALTY INSURANCE AGENCY INC. at (800) 542-6792.

## MESSAGES

PLEASE REFER TO THE "IMPORTANT NOTICES" SECTION OF THIS POLICY FOR IMPORTANT INFORMATION CONCERNING THIS POLICY.

Your Coverage C Limit has been increased at no additional charge.

## BASIC POLICY COVERAGES

### SECTION I PROPERTY COVERAGES          LIMITS OF LIABILITY

SH DC 18 (09-13)                                        - 1 -



PLAINTIFF'S EXHIBIT
tabbies®
A

| | | |
|---|---|---|
| A. | DWELLING | $ 816,070 |
| B. | OTHER STRUCTURES | $ 81,607 |
| C. | PERSONAL PROPERTY | $ 408,035 |
| D. | LOSS OF USE | $ 163,214 |

## SECTION I DEDUCTIBLE
We will pay only that part of the total of all loss and expense payable under Section I that exceeds: $ 1,000.

| SECTION II LIABILITY COVERAGES | LIMITS OF LIABILITY |
|---|---|
| E. PERSONAL LIABILITY – EACH OCCURRENCE | $ 500,000 |
| F. MEDICAL PAYMENTS TO OTHERS | $ 5,000 |

## ADDITIONAL COVERAGES

Extended Dwelling Replacement Cost
        Limit: 25%

Water Backup
        Limit: $10,000
        Deductible: $250

## ATTACHMENTS

The following forms, endorsements and exceptions to conditions are part of the policy at time of issue. *Please read them carefully.*

| FORM NO. | EDITION DATE | TITLE |
|---|---|---|
| HO 3000-VA | 09 14 | HOMEOWNERS SPECIAL FORM - VIRGINIA |
| SH 01 45 | 10 15 | SPECIAL PROVISIONS - VIRGINIA |
| SH 06 01 | 06 05 | IDENTITY THEFT RESOLUTION ASSISTANCE |
| SH 23 45 | 08 13 | PERSONAL PROPERTY REPLACEMENT COST LOSS SETTLEMENT - VIRGINIA |
| SH 23 48 | 08 13 | ADDITIONAL PERCENTAGE OF INSURANCE FOR COVERAGE A - DWELLING - MAXIMUM OF 25% - VIRGINIA FORM HO 3000-VA ONLY |
| SH 23 53 | 08 13 | LIMITED WATER BACK-UP AND SUMP DISCHARGE OR OVERFLOW COVERAGE - VIRGINIA |

*If you have chosen the Scheduled Personal Property Endorsement, please refer to that section which appears later in these policy declarations.*

## PREMIUM INFORMATION

| | |
|---|---|
| BASIC PREMIUM | $ 2,808 |
| ADDITIONAL COVERAGES | $ 40 |
| TOTAL PREMIUM | $ 2,848 |
| Expense Fee | $ 27 |
| TOTAL | $ 2,875 |

Case 1:21-cv-00207-TDS-JEP   Document 7-1   Filed 04/06/21   Page 10 of 100

# MORTGAGEE/ADDITIONAL INSUREDS/ADDITIONAL INTERESTS

**Mortgagee**
Bank of America  Fay Servicing
Po Box 619063
Dallas , TX 75261-9063
Loan#: 0000180892

# RATING INFORMATION

| RISK STATE | OCCUPANCY | COUNTY | ZIP CODE | FAMILIES | CONSTRUCTION | YEAR |
|---|---|---|---|---|---|---|
| VA | PRIMARY | FAIRFAX | 22066 | I | MASONRY VENEER | 1978 |

| FEET TO HYDRANT | MILES TO STATION | PROTECTION CLASS | ROOF TYPE | ROOF AGE |
|---|---|---|---|---|
| 0 -500 | 0-5 | I | Asphalt or Composition Shingle | 9 |

| PRIMARY HEATING SOURCE | RATING DATE |
|---|---|
| ELECTRIC | 01-02-2018 |

Includes Copyrighted Material of Insurance Services Office, Inc. with its permission
Copyright, Insurance Services Office, Inc. 1988-2019

# IMPORTANT NOTICES

Case 1:21-cv-00207-TDS-JEP   Document 7-1   Filed 04/06/21   Page 11 of 100

**Integon National Insurance Company**

In witness whereof, we, as officers of the Company, have caused this policy to be executed and attested. If required by state law, this policy shall not be valid unless countersigned by our authorized representative. This form is attached to and becomes a part of the policy.

_____
President

_____
Secretary

10550 (05012014)

## *IMPORTANT NOTICE*
## *INSURANCE SCORING*

At the time of your application for insurance, we may review your credit report or obtain or use a credit based insurance score based on the information contained in that credit report. We may use a third party in connection with the development of your insurance score. The insurance score is NOT the sole factor in determining the cost of your policy, but is used in combination with the traditional factors to provide you with the best premium for which you qualify.

If you determine that any of your consumer reports contain an inaccuracy that has since been corrected by the consumer reporting agency, or, if you feel your insurance score has improved, please contact your agent. If an improved score results in a lower premium, your agent will be able to issue you a new policy.

J10109 07 13

## IMPORTANT INFORMATION REGARDING YOUR INSURANCE

In the event you need to contact someone about this insurance for any reason, please contact your independent agent. If you have additional questions, you may contact National General Insurance at the following address and telephone number:

National General Insurance
PO Box 3199
Winston Salem, NC 27102-3199
(800) 542-6792

If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact the Virginia State Corporation Commission's Bureau of Insurance at:

Bureau of Insurance
P.O. Box 1157
Richmond, VA 23218-1157
(800) 552-7945 (VA only)
(804) 371-9741

Written correspondence is preferable so that a record of your inquiry is maintained.  When contacting your agent, company or the Bureau of Insurance, have your policy number available.

SH PN 48   09 13
## *EARTHQUAKE COVERAGE EXCLUSION NOTICE*

Your homeowners policy does not include earthquake coverage.  Such coverage is excluded unless purchased by endorsement.  For information regarding available earthquake coverage, please contact your independent agent or broker.

## Adverse Underwriting Decision Notice

As required by state law and the Fair Credit Reporting Act, we are writing to advise you that the rate we assigned your homeowners insurance policy may not be our lowest rate. At National General Insurance we use insurance bureau scoring based on consumer credit reports, along with other eligibility factors such as prior loss history, in determining the most appropriate rates to apply. Based on these factors we have issued your policy at the lowest rate we have available to you.

The following factors were the primary influences on your credit-based insurance bureau score as reported to National General Insurance. These factors are the reasons you received less than the maximum possible score. Please keep in mind that very few consumers receive the maximum score possible.

Hit

Presence of adverse public records

Presence of collection account

Too many recent credit checks

We secured loss information reports (APLUS) and insurance bureau scores from the consumer reporting agencies shown below. Please note that these agencies did not make any premium or rating decisions and they are unable to explain your policy premium.

As provided in the Fair Credit Reporting Act, you are entitled to obtain a free copy of each of your consumer reports within 60 days of receiving this notice. You will need to contact the consumer reporting agencies directly to dispute the accuracy or completeness of any information. If you determine that any of your consumer reports contain an inaccuracy that has since been corrected by the consumer reporting agency, please contact your agent. If an improved score results in a lower premium, your agent will be able to issue you a new policy.

Credit Reports
Equifax Consumer Services
P.O. Box 740241
Atlanta, GA 30374-4094
1-800-685-1111

APLUS Reports
ISO/APLUS Consumer Inquiry Center
545 Washington Boulevard, 22nd Floor
Jersey City, NJ 07310-1686
1-800-709-8842

If you have questions about our rating action, please submit them to us in writing to us at the address listed below within 90 business days of the date we mailed this notice to you. We will respond in writing within 21 days after receiving your request.

Privacy Administrator
National General Insurance
PO Box 3199
Winston Salem, NC 27102-3199

J 10108 03 13

# National General Insurance Group
## Privacy Notice

*The National General Insurance Group\* is giving you this notice to tell you how we may collect and share nonpublic personal information about you and the accounts you have with a company (or companies) in the National General Insurance Group. This notice also advises you of your right to keep this information from being shared with affiliates of the National General Insurance Group\*\* or other business associates (non-affiliates) under certain circumstances and your right to limit marketing, in some cases.*

## What Nonpublic Personal Information Do We Collect About You?

We collect non-public personal information about you and the members of your household from the following sources:

- Information we receive from you, such as information on applications or other forms, which may include your name, address, e-mail address, social security number and driving history.
- Information about your transactions with us, our affiliates, or others, such as your account balance and payment history.
- Information we receive from outside sources such as consumer reporting agencies, insurance agencies and state motor vehicle departments which may provide information on your credit history, credit score, driving and accident history, or prior insurance coverage in place. Please note that the information obtained from outside sources may be retained by those outside sources and disclosed to other persons without our knowledge.
- Information about your computer hardware and software that may be collected by us if you contact our Website electronically. This information can include: your IP address, browser type, domain names, access times, and referring Website addresses. This information is used for the operation of the website, to maintain quality of the website, and to provide general statistics regarding use of our Website.
- If you obtain a life, long-term care or disability product, information we receive from you, medical professionals who have provided care to you and insurance support organizations regarding your health.

## How Do We Protect The Information That We Collect About You and Your Accounts?

To protect the privacy and security of nonpublic personal information we collect about you, we restrict access to the information to our employees, agents and subcontractors who need this information to provide products and services to you. We maintain physical, electronic, and procedural safeguards that comply with applicable federal and state laws and regulations to guard your non-public personal information. We strive to keep our information about you accurate. We require those individuals to whom we permit access to your customer information to protect it and keep it confidential. You may review the information we have collected on your account and if you tell us of an error, we will update our records promptly. If you wish to review or correct personal information on your account, please write to us at the address on your account statement or other account materials.

## Do We Share The Information We Collect About You and Your Accounts?

Yes, to provide you with superior service, inform you of product and service opportunities that may be of interest to you, or for other business purposes, **we may share** all of the nonpublic personal information we collect about you and your accounts, as described above, as permitted by law. Our sharing of information about you is subject to Your Rights, described below. However, we do not sell, rent or lease our customer lists to third parties.

We will disclose your personal information, without notice, only if required to do so by law or in the good faith belief that such action is necessary to: (a) conform to the edicts of the law or comply with legal process served on us; (b) protect and defend our rights or property; (c) act under exigent circumstances to protect the personal safety of our customers, or the public; and (d) to process insurance claims.

**For Vermont Residents Only:** Based on Vermont law, we do not share nonpublic personal information about you with affiliates or non-affiliated third parties, other than as permitted by law. We automatically treat your accounts as if you made the Information Sharing and Affiliate Marketing opt out elections described below.

## What Types of Affiliates and Non-affiliated Third Parties Do We Share Information About You With?

Subject to Your Rights, detailed below, **we may share** nonpublic personal information about you with the following types of affiliates and non-affiliated third parties:

- Financial service providers, such as, credit card issuers, insurance companies, and insurance agents.
- Non-financial companies, such as credit reporting agencies, manufacturers, motor vehicle dealers, retailers, direct marketers, telecommunications companies, airlines, management companies, attorneys in fact, and publishers.
- Companies that perform marketing services on our behalf or with other institutions with which we have joint marketing agreements.
- Others, such as educational institutions.

06159 (08012017)

We may also share nonpublic personal information about you with affiliates and non-affiliated third parties, as permitted by law, including consumer report information, such as information from credit reports and certain application information that we have received from you and from third parties, such as consumer reporting agencies and insurance support organizations

*Reference to the National General Insurance Group in this notice includes the following companies: National General Insurance Company, National General Assurance Company, National General Insurance Online, Inc., Integon Casualty Insurance Company, Integon General Insurance Corporation, Integon Indemnity Corporation, Integon National Insurance Company, Integon Preferred Insurance Company, New South Insurance Company, MIC General Insurance Corporation, Home State County Mutual Insurance Company – (Administered by Integon National Insurance Company, National General Insurance Company, Imperial Fire & Casualty Insurance Company or Integon Indemnity Corporation), National General Motor Club, Inc., National Health Insurance Company, Agent Alliance Insurance Company, National General Premier Insurance Company, Imperial Fire & Casualty Insurance Company, Adirondack Insurance Exchange, Mountain Valley Indemnity Company, New Jersey Skylands Insurance Association, New Jersey Skylands Insurance Company, Century-National Insurance Company, Standard Property and Casualty Insurance Company, Direct Insurance Company, Direct General Insurance Company, Direct General Insurance Company of Louisiana, Direct General Insurance Company of Mississippi, Direct National Insurance Company, Direct General Life Insurance Company, and Old American County Mutual Fire Insurance Company (Administered by Direct General Insurance Agency).

**Affiliates of the National General Insurance Group include: companies in the National General Insurance Group referenced in this notice, and companies that now or in the future control, are controlled by, or are under common control with a company in the National General Insurance Group.

## Do We Share Information About Former Customers?
Yes, subject to Your Rights - detailed below, **we may share** all of the nonpublic personal information described above about our former customers with the same types of affiliates and non-affiliated third parties, as described above, as permitted by law.

## Your Rights:
### Information Sharing
- If you want a company in the National General Insurance Group not to share nonpublic personal information about you with affiliates, non-affiliated third parties, or both, **you may opt out of Information Sharing**. That is, you may direct the company in the National General Insurance Group not to share information (other than as permitted by law). Information Sharing permitted by law includes, for example, sharing with companies that work for a company in the National General Insurance Group to provide the product or services you request and sharing with affiliates information about our transactions or experiences with you for everyday business purposes.
- Your Information Sharing opt out direction will apply to nonpublic personal information, as described above, that the company in the National General Insurance Group has collected about you and your existing accounts.

### Affiliate Marketing
- Federal law gives you the right to limit some but not all marketing from the companies in the National General Insurance Group and their affiliates. You may limit companies in the National General Insurance Group and their affiliates from marketing their products or services to you **based on nonpublic personal information about you that they receive from a company in the National General Insurance Group**. This information includes income, account information, credit history, and payment history.
- Your choice to limit Affiliate Marketing will apply to nonpublic information about you and your existing account.

### Modifications to our privacy policy
We reserve the right to change our privacy practices in the future, which may include sharing nonpublic personal information about you with nonaffiliated third parties. Before we do that, we will provide you with a revised privacy notice and give you the opportunity to opt-out of that type of information sharing.

### How to Opt Out of Information Sharing or Limit Affiliate Marketing:
- If you wish to opt out of Information Sharing with affiliates, or with non-affiliated third parties, or with both, or to limit Affiliate Marketing, other than as permitted by law, please complete the form below and return it to the following address:

    National General Insurance
    PO Box 3199
    Winston-Salem, NC 27102-3199

- Each time you establish a new account with a company in the National General Insurance Group, you will receive a privacy notice and an opportunity to opt out of Information Sharing and limit Affiliate Marketing for that account, as permitted by law.

If you have a joint account with another person, either of you may opt out of Information Sharing or limit Affiliate Marketing (other than as permitted by law) for both of you.

08159 (08012017)

I direct my information not be shared with affiliates or with non-affiliated third parties, and to limit Affiliate Marketing, other than as permitted by law.

Palwinder Singh
Named Insured

2005979640
Account (Policy) Number:

Signature

Date

Co-Named Insured

Signature

Date

Note: No action is required if you wish to permit information sharing as described in this notice. If you have already told us not to share your information on this account, you do not need to tell us again.

06159 (08012017)

## *IMPORTANT FLOOD INSURANCE NOTICE*

Your homeowners or dwelling policy does NOT provide coverage for loss caused by flood or mudslide, which is defined, in part, by the National Flood Insurance Program as:

> A general and temporary condition of partial or complete inundation of normally dry land areas from overflow of inland or tidal waters or from the unusual and rapid accumulation or runoff of surface waters from any source.

If you are required by your mortgage lender to have flood insurance on your property, or if you feel that your property is susceptible to flood damage, insurance covering damage from flood is available on most buildings and contents in participating communities through the National Flood Insurance Program.  Contents coverage may be available with a flood policy for an additional premium.

Information about flood insurance and whether your community participates in the program can be obtained from your insurance company, from your insurance agent/broker, or directly from the National Flood Insurance Program by calling 1-800-638-6620 or via their website at http://www.floodsmart.gov.

# ONECHOICE HOMEOWNERS POLICY
## TABLE OF CONTENTS

| | Page |
|---|---|
| AGREEMENT | 1 |
| DEFINITIONS | 1 |
| DEDUCTIBLE | 2 |

**SECTION I**

| | |
|---|---|
| PROPERTY COVERAGES | 2 |
| Coverage A – Dwelling | 2 |
| Coverage B – Other Structures | 2 |
| Coverage C – Personal Property | 3 |
| Coverage D – Loss of Use | 5 |
| Additional Coverages | 5 |
| PERILS INSURED AGAINST | 8 |
| EXCLUSIONS | 11 |
| CONDITIONS | 13 |

**SECTION II**

| | |
|---|---|
| LIABILITY COVERAGES | 16 |
| Coverage E – Personal Liability | 16 |
| Coverage F – Medical Payments To Others | 16 |
| EXCLUSIONS | 16 |
| ADDITIONAL COVERAGES | 20 |
| CONDITIONS | 20 |

**SECTIONS I AND II**

| | |
|---|---|
| CONDITIONS | 21 |

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**AGREEMENT**

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

**DEFINITIONS**

A. In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance.

B. In addition, certain words and phrases are defined as follows:

1. "Aircraft Liability", "Motor Vehicle Liability" and "Watercraft Liability", subject to the provisions in b. below, mean the following:

   a. Liability for "bodily injury" or "property damage" arising out of the:

   (1) Ownership of such vehicle or craft by an "insured";

   (2) Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

   (3) Entrustment of such vehicle or craft by an "insured" to any person;

   (4) Failure to supervise or negligent supervision of any person involving such vehicle or craft by an "insured"; or

   (5) Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

   b. For the purpose of this definition:

   (1) Aircraft means any contrivance used or designed for flight except model aircraft;

   (2) Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

   (3) Motor vehicle means a "motor vehicle" as defined in 7. below.

2. "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

3. "Business" means:

   a. A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

   b. Any other activity engaged in for money or other compensation, except the following:

   (1) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

   (2) Providing home day care services for which no compensation is received, other

than the mutual exchange of such services; or

   (3) The rendering of home day care services to a relative of an "insured".

4. "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

5. "Insured" means:

   a. You and residents of your household who are:

   (1) Your relatives; or

   (2) Other persons under the age of 21 and in the care of you or any person described in a.(1) of this provision;

   b. Under Section II:

   (1) With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in a. above. "Insured" does not mean a person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner; or

   (2) With respect to a "motor vehicle" to which this policy applies:

   (a) Persons while engaged in your employ or that of any person included in a. above; or

   (b) Other persons using the vehicle on an "insured location" with your consent.

   Under both Sections I and II, when the word an immediately precedes the word "insured", the words an "insured" together mean one or more "insureds".

6. "Insured location" means:

   a. The "residence premises";

   b. The part of other premises, other structures and grounds used by you as a residence; and

   (1) Which is shown in the Declarations; or

   (2) Which is acquired by you during the policy period for your use as a residence;

   c. Any premises used by you in connection with a premises described in a. and b. above;

   d. Any part of a premises:

   (1) Not owned by an "insured"; and

   (2) Where an "insured" is temporarily residing;

   e. Vacant land, other than farm land, owned

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

by or rented to an "insured";

f.  Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";

g.  Individual or family cemetery plots or burial vaults of an "insured"; or

h.  Any part of a premises occasionally rented to an "insured" for other than "business" use.

7.  "Motor vehicle" means:

a.  A self-propelled land vehicle; or

b.  Any trailer or semi-trailer which is being carried on, towed by or hitched for towing by a vehicle described in a. above.

8.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

a.  "Bodily injury"; or

b.  "Property damage".

9.  "Property damage" means physical injury to, destruction of, or loss of use of tangible property.

10. "Residence employee" means:

a.  An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm, under an agreement between an "insured" and the labor leasing firm, whose duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

b.  One who performs similar duties elsewhere not related to the "business" of an "insured".

11. "Residence premises" means:

a.  The one family dwelling where you reside;

b.  The two family dwelling where you reside in at least one of the family units; or

c.  That part of any other building where you reside;

and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

**DEDUCTIBLE**

Unless otherwise noted in this policy, the following deductible provision applies:

Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section I that exceeds the deductible amount shown in the Declarations.

**SECTION I – PROPERTY COVERAGES**

A.  **Coverage A – Dwelling**

1.  We cover:

a.  The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

b.  Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

2.  We do not cover land, including land on which the dwelling is located.

B.  **Coverage B – Other Structures**

1.  We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

2.  We do not cover:

a.  Land, including land on which the other structures are located;

b.  Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage;

c.  Other structures from which any "business" is conducted; or

d.  Other structures used to store "business" property. However, we do cover a structure that contains "business" property solely owned by an "insured" or a tenant of the dwelling provided that "business" property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure.

3.  The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

C.  **Coverage C – Personal Property**

1.  **Covered Property**

We cover personal property owned or used by an "insured" while it is anywhere in the world. At your request, we will cover personal property owned by:

a.  Others while the property is on the part of the "residence premises" occupied by an "insured";

b.  A guest while the property is in any residence occupied by an "insured"; and

c.  A "residence employee" while the property:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

(1) Is in any residence occupied by an "insured"; or

(2) Is in the physical custody of that employee and that employee is engaged in the service of an "insured".

**2. Limit For Property At Other Residences**

Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises", is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater. However, this limitation does not apply to personal property:

a. Moved from the "residence premises" because it is being repaired, renovated or rebuilt and is not fit to live in or store property in; or

b. In a newly acquired principal residence for 30 days from the time you begin to move the property there.

**3. Special Limits Of Liability**

The special limit for each category shown below is the total limit for each loss for all property in that category. These special limits do not increase the Coverage C limit of liability.

a. $200 on money, bank notes, bullion, numismatic property, gold other than goldware or gold-plated ware, silver other than silverware or silver-plated ware, platinum and coins.

b. $1,000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

c. $1,000 on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors.

d. $1,000 on trailers or semi-trailers not used with watercraft of all types.

e. $1,500 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

f. $500 for loss by theft of firearms and related equipment.

g. $1,000 on portable electronic equipment that:

(1) Reproduces, receives, records or transmits sound;

(2) Is designed to be operated by more than one power source, one of which is a "motor vehicle's" electrical system; and

(3) Is in or upon a "motor vehicle".

Electronic equipment includes accessories and antennas.

h. $250 for tapes, wires, records, disks or other media that are:

(1) Used with electronic equipment that reproduces, receives, records or transmits sound; and

(2) In or upon a "motor vehicle".

**4. Property Not Covered**

We do not cover:

a. Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

b. Animals, birds or fish;

c. "Motor vehicles". This includes electronic equipment that:

(1) Reproduces, receives, records or transmits sound; and

(2) Is designed to be operated solely by use of the power from a "motor vehicle's" electrical system.

Electronic equipment includes accessories and antennas.

We do cover "motor vehicles" not required to be registered for use on public roads or property which are:

(1) Used solely to service an "insured's" residence; or

(2) Designed to assist the handicapped;

d. Aircraft and parts. Aircraft means any contrivance used or designed for flight, except model aircraft;

e. Property of roomers, boarders and other tenants, except property of:

(1) "Residence employees"; or

(2) Roomers and boarders related to an "insured";

f. Property in an apartment regularly rented or held for rental to others by an "insured", except as provided in E.9. Landlord's Furnishings under Section I – Property Coverages;

g. Property rented or held for rental to others off the "residence premises";

h. "Business" data, including such data stored in:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

(1) Books of account, drawings or other paper records; or

(2) Computers and related equipment.

We do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market;

i. "Business" property in storage or held as a sample or for sale or delivery after sale:

j. "Business" property away from the "residence premises";

k. "Business" property pertaining to a "business" actually conducted on the "residence premises"; or

l. Credit cards, electronic fund transfer cards or access devices used solely for deposit, withdrawal or transfer of funds except as provided in E.6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section I – Property Coverages.

## D. Coverage D – Loss Of Use

The limit of liability for Coverage D is the total limit for the coverages in 1. Additional Living Expense, 2. Fair Rental Value and 3. Civil Authority Prohibits Use below.

### 1. Additional Living Expense

If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.

Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

### 2. Fair Rental Value

If a loss covered under Section I makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.

Payment will be for the shortest time required to repair or replace such premises.

### 3. Civil Authority Prohibits Use

If a civil authority prohibits you from use of the "residence premises" as a result of direct damage to neighboring premises by a Peril Insured Against, we cover the loss as provided in 1. Additional Living Expense and 2. Fair Rental Value above for no

more than two weeks.

### 4. Loss Or Expense Not Covered

We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under 1. Additional Living Expense, 2. Fair Rental Value and 3. Civil Authority Prohibits Use above are not limited by expiration of this policy.

No deductible applies to this coverage.

## E. Additional Coverages

### 1. Debris Removal

We will pay your reasonable expense for the removal of debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss. We will also pay your reasonable expense for removal of fallen trees which cause damage to covered property.

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

### 2. Reasonable Repairs

a. We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

b. If the measures taken involve repair to other damaged property, we will only pay if that property is covered under this policy and the damage is caused by a Peril Insured Against. This coverage does not:

(1) Increase the limit of liability that applies to the covered property; or

(2) Relieve you of your duties, in case of a loss to covered property, described in B.4. under Section I – Conditions.

### 3. Trees, Shrubs And Other Plants

We cover trees, shrubs, plants or lawns, on the "residence premises", for loss caused by the following Perils Insured Against:

a. Fire or Lightning;

b. Explosion;

c. Riot or Civil Commotion;

d. Aircraft;

e. Vehicles not owned or operated by a resident of the "residence premises";

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

f. Vandalism or Malicious Mischief; or

g. Theft.

We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be paid for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

This coverage is additional insurance.

4. **Fire Department Service Charge**

   a. We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

   b. If the fire department service charge is not covered under the terms of Paragraph a., then the following applies:

      We will pay up to $250 for your liability assumed for fire department charges incurred when a volunteer fire department is called in to save or protect covered property from a Peril Insured Against.

      This Additional Coverage applies to your liability for service charges billed to you by a volunteer fire department, provided that:

      (1) The volunteer fire department is not fully funded by real estate taxes or other property taxes; and

      (2) The charge is not made pursuant to a contract for service outside the volunteer fire department's fire protection district, city or municipality.

   This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed**

   We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.

   This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money**

   a. We will pay up to $500 for:

      (1) The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

      (2) Loss resulting from theft or unauthorized use of an electronic fund transfer card or access device used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

      (3) Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

      (4) Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

      All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

      This coverage is additional insurance. No deductible applies to this coverage.

   b. We do not cover:

      (1) Use of a credit card, electronic fund transfer card or access device:

         (a) By a resident of your household;

         (b) By a person who has been entrusted with either type of card or access device; or

         (c) If an "insured" has not complied with all terms and conditions under which the cards are issued or the devices accessed; or

      (2) Loss arising out of "business" use or dishonesty of an "insured".

   c. If the coverage in a. above applies, the following defense provisions also apply:

      (1) We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

      (2) If a suit is brought against an "insured" for liability under a.(1) or (2) above, we will provide a defense at our expense by counsel of our choice.

      (3) We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under a.(3) above.

7. **Loss Assessment**

   a. We will pay up to $1,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Case 1:21-cv-00207-TDS-JEP   Document 7-1   Filed 04/06/21   Page 26 of 100

the "residence premises", by a corporation or association of property owners. The assessment must be made as a result of direct loss to property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against under Coverage **A**, other than:

**(1)** Earthquake; or

**(2)** Land shock waves or tremors before, during or after a volcanic eruption.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will only apply one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

**b.** We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

**c.** Paragraph **P. Policy Period** under **Section I – Conditions** does not apply to this coverage.

This coverage is additional insurance.

**8. Glass Or Safety Glazing Material**

**a.** We cover:

**(1)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

**(2)** The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window when caused directly by earth movement; and

**(3)** The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

**b.** This coverage does not include loss:

**(1)** To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

**(2)** On the "residence premises" if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movement as provided in **a.(2)** above. A dwelling being constructed is not considered vacant.

**c.** This coverage does not increase the limit of

liability that applies to the damaged property.

**9. Landlord's Furnishings**

We will pay up to $2,500 for your appliances, carpeting and other household furnishings, in each apartment on the "residence premises" regularly rented or held for rental to others by an "insured", for loss caused by a Peril Insured Against in Coverage **C**, other than Theft.

This limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

This coverage does not increase the limit of liability applying to the damaged property.

**10. Ordinance Or Law**

**a.** You may use up to 10% of the limit of liability that applies to Coverage **A** for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

**(1)** The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

**(2)** The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

**(3)** The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

**b.** You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

**c.** We do not cover:

**(1)** The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

**(2)** The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor,

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This coverage is additional insurance.

**11. Grave Markers**

We will pay up to $1,000 for grave markers, including mausoleums, on or away from the "residence premises" for loss caused by a Peril Insured Against under Coverage C.

This coverage does not increase the limits of liability that apply to the damaged covered property.

## SECTION I – PERILS INSURED AGAINST

**A. Coverage A – Dwelling And Coverage B – Other Structures**

1. We insure against direct physical loss to property described in Coverages A and B.

2. We do not insure, however, for loss:

   a. Excluded under Section I – Exclusions;

   b. Caused by:

      (1) Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed, unless you have used reasonable care to:

         (a) Maintain heat in the building; or

         (b) Shut off the water supply and drain all systems and appliances of water.

         However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

         For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

      (2) Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

         (a) Fence, pavement, patio or swimming pool;

         (b) Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

         (c) Retaining wall or bulkhead that does not support all or part of a building or other structure; or

         (d) Pier, wharf or dock;

      (3) Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

      (4) Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

      (5) Continuous or repeated seepage or leakage of water or steam over a period of weeks, months, or years:

         (a) From a plumbing, heating, air conditioning or automatic fire protection system or from within a domestic appliance; or

         (b) From within or around any plumbing fixtures, including, but not limited to, shower stalls, shower baths, tub installations, sinks, faucets, drains, basins or other fixtures including walls, ceilings or floors; or

      (6) Any of the following:

         (a) Wear and tear, marring, deterioration;

         (b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

         (c) Smog, rust or other corrosion, fungi, mold, wet or dry rot;

         (d) Smoke from agricultural smudging or industrial operations;

         (e) Contamination or discharge, dispersal, seepage, migration, release or escape

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

of pollutants unless the contamination or discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

(f) Settling, shrinking, bulging or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

(g) Birds, vermin, rodents or insects; or

(h) Animals owned or kept by an "insured".

**Exception To b.(6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage A or B resulting from a sudden and accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Section I – Exclusion A.3. Water, Paragraphs a. and c. that apply to surface water and water below the surface of the ground do not apply to loss by water covered under b.(6) above.

Under 2.b. above, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

**B. Coverage C – Personal Property**

We insure for direct physical loss to the property described in Coverage C caused by any of the following perils unless the loss is excluded in Section I – Exclusions.

1. **Fire Or Lightning**

2. **Windstorm Or Hail**

   This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building. This limitation does not apply to rowboats and canoes on the "residence premises".

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

3. **Explosion**

4. **Riot Or Civil Commotion**

5. **Aircraft**

   This peril includes self-propelled missiles and spacecraft.

6. **Vehicles**

7. **Smoke**

   This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism Or Malicious Mischief**

9. **Theft**

   a. This peril includes attempted theft and loss of property from a known place when it is likely that the property has been stolen. Any theft must be promptly reported to the police.

   b. This peril does not include loss caused by theft:

      (1) Committed by an "insured";

      (2) In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

      (3) From the "residence premises" while the portion of the "residence premises"

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

customarily occupied exclusively by an insured is rented to others:

(a) Caused by a tenant, members of the tenant's household, or the tenant's employees;

(b) Of money, bank notes, bullion, numismatic property, gold, goldware, gold-plated ware, silver, silverware, silver-plated ware, pewterware, platinum and coins;

(c) Of securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps; or

(d) Of jewelry, watches, furs, precious and semiprecious stones;

(4) That occurs off the "residence premises" of:

(a) Trailers, semi-trailers and campers;

(b) Watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

(c) Property while at any other residence owned by, rented to, or occupied by an "insured", except while an "insured" is temporarily living there. Property of an "insured" who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 90 days immediately before the loss.

## 10. Falling Objects

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

## 11. Weight Of Ice, Snow Or Sleet

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

## 12. Accidental Discharge Or Overflow Of Water Or Steam

a. This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

b. This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in Peril Insured Against 14. Freezing; or

(3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises".

c. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

d. Section I – Exclusion A.3. Water, Paragraphs a. and c. that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

## 13. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

## 14. Freezing

a. This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the "residence premises" while the dwelling is vacant, unoccupied, or being constructed, unless you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

b. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

**15. Sudden And Accidental Damage From Artificially Generated Electrical Current**

This peril does not include loss to tubes, transistors, electronic components or circuitry that is a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

**16. Volcanic Eruption**

This peril does not include loss caused by earthquake, land shock waves or tremors.

**17. Collapse Of A Building Or Any Part Of A Building**

This peril does not include settling, cracking, shrinking, bulging or expansion.

## SECTION I – EXCLUSIONS

**A.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

**1. Ordinance Or Law**

Ordinance Or Law means any ordinance or law:

   **a.** Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This Exclusion A.1.a. does not apply to the amount of coverage that may be provided for in E.10. Ordinance Or Law under Section I – Property Coverages;

   **b.** The requirements of which result in a loss in value to property; or

   **c.** Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

   Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This Exclusion A.1. applies whether or not the property has been physically damaged.

**2. Earth Movement**

Earth Movement means:

   **a.** Earthquake, including land shock waves or tremors before, during or after a volcanic eruption;

   **b.** Landslide, mudslide or mudflow;

   **c.** Subsidence or sinkhole; or

   **d.** Any other earth movement including earth sinking, rising, erosion, creeping, expanding, bulging, cracking, settling, contracting or shifting.

This Exclusion A.2. applies regardless of whether any of the above, in A.2.a. through A.2.d., is caused by an act of nature or is otherwise caused.

However, direct loss by fire, explosion or theft resulting from any of the above, in A.2.a. through A.2.d., is covered.

**3. Water**

This means:

   **a.** Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge;

   **b.** Water which:

      **(1)** Backs up through sewers or drains; or

      **(2)** Overflows or is otherwise discharged from a sump, sump pump or related equipment; or

   **c.** Water below the surface of the ground, regardless of its source, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure.

This Exclusion A.3. applies regardless of whether any of the above, in A.3.a. through A.3.c., is caused by an act of nature or is otherwise caused.

However, direct physical loss by fire, explosion or theft resulting from any of the above, in A.3.a. through A.3.c., is covered.

**4. Power Failure**

Power Failure means the failure of power or other utility service if that failure takes place off the "residence premises". But if the failure results in a loss, from a Peril Insured Against on the "residence premises", we will pay for the loss caused by that peril.

**5. Neglect**

Neglect means neglect of an "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

**6. War**

War includes the following and any consequence of any of the following:

   **a.** Undeclared war, civil war, insurrection,

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

rebellion or revolution;

**b.** Warlike act by a military force or military personnel; or

**c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

**7. Nuclear Hazard**

This Exclusion **A.7.** pertains to Nuclear Hazard to the extent set forth in **M.** Nuclear Hazard Clause under Section **I** – Conditions.

**8. Intentional Loss**

We do not provide coverage for an "insured" who commits or conspires to commit an act with the intent to cause a loss.

**9. Governmental Action**

Governmental Action means:

**a.** Destruction or seizure under quarantine or customs regulations; or

**b.** Confiscation by order of any governmental or public authority;

of property described in Coverage **A, B** or **C.**

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

**B.** We do not insure for loss to property described in Coverages **A** and **B** caused by any of the following. However, any ensuing loss to property described in Coverages **A** and **B** not precluded by any other provision in this policy is covered.

**1.** Weather conditions. However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in **A.** above to produce the loss.

**2.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

**3.** Faulty, inadequate or defective:

**a.** Planning, zoning, development, surveying, siting;

**b.** Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**c.** Materials used in repair, construction, renovation or remodeling; or

**d.** Maintenance;

of part or all of any property whether on or off the "residence premises".

**SECTION I – CONDITIONS**

**A. Insurable Interest And Limit Of Liability**

Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

**1.** To an "insured" for more than the amount of such "insured's" interest at the time of loss; or

**2.** For more than the applicable limit of liability.

**B. Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:

**1.** Give prompt notice to us or our agent;

**2.** Notify the police in case of loss by theft;

**3.** Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in **E.6.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages;

**4.** Protect the property from further damage. If repairs to the property are required, you must:

**a.** Make reasonable and necessary repairs to protect the property; and

**b.** Keep an accurate record of repair expenses;

**5.** Cooperate with us in the investigation of a claim;

**6.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

**7.** As often as we reasonably require:

**a.** Show the damaged property;

**b.** Provide us with records and documents we request and permit us to make copies; and

**c.** Submit to examination under oath and sign the same;

**8.** Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

**a.** The time and cause of loss;

**b.** The interests of all "insureds" and all others in the property involved and all liens on the property;

**c.** Other insurance which may cover the loss;

**d.** Changes in title or occupancy of the property

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

during the term of the policy;

e.  Specifications of damaged buildings and detailed repair estimates;

f.  The inventory of damaged personal property described in 6. above;

g.  Receipts for additional living expenses incurred and records that support the fair rental value loss; and

h.  Evidence or affidavit that supports a claim under **E.6. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money** under Section I – Property Coverages, stating the amount and cause of loss.

## C. Loss Settlement

In this Condition **C.**, the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in **E.10. Ordinance Or Law** under Section I – Property Coverages. Covered property losses are settled as follows:

1.  Property of the following types:

    a.  Personal property;

    b.  Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

    c.  Structures that are not buildings;

    d.  Grave markers, including mausoleums;

    e.  Cesspools, septic tanks and septic fields; and

    f.  Swimming pools;

    at actual cash value at the time of loss but not more than the amount required to repair or replace.

2.  Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

    a.  If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

        (1) The limit of liability under this policy that applies to the building;

        (2) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

        (3) The necessary amount actually spent to repair or replace the damaged building.

        If the building is rebuilt at a new premises, the cost described in (2) above is limited to the cost which would have been incurred if the building had been built at the original premises.

    b.  If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

        (1) The actual cash value of that part of the building damaged; or

        (2) That proportion of the cost to repair or replace, after application of any deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

    c.  To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

        (1) Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

        (2) Those supports described in (1) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

        (3) Underground flues, pipes, wiring and drains.

    d.  We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in 2.a. above.

        However, if the cost to repair or replace the damage is both:

        (1) Less than 5% of the amount of insurance in this policy on the building; and

        (2) Less than $2,500;

        we will settle the loss as noted in 2.a. and b. above whether or not actual repair or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

replacement is complete.

e. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You may then make claim, in accordance with the provisions of this Condition C. Loss Settlement, for the difference between the actual cash value and the replacement cost of the buildings within six months of the later of:

(1) The last date you received a payment for actual cash value; or

(2) The date of entry of a final order of a court of competent jurisdiction declaring your right to replacement cost.

## D. Loss To A Pair Or Set

In case of loss to a pair or set we may elect to:

1. Repair or replace any part to restore the pair or set to its value before the loss; or

2. Pay the difference between actual cash value of the property before and after the loss.

## E. Appraisal

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

1. Pay its own appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If the written demand is made by us, then you shall be reimbursed by us for the reasonable cost of your appraiser and your portion of the cost of the umpire.

## F. Other Insurance

If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance

covering the loss.

## G. Suit Against Us

No action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss.

## H. Our Option

If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

## I. Loss Payment

We will adjust all losses with you. We will pay you unless some other person is named in the policy to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

1. Reach an agreement with you;

2. There is an entry of a final judgment; or

3. There is a filing of an appraisal award with us.

## J. Abandonment Of Property

We need not accept any property abandoned by an "insured".

## K. Mortgage Clause

The word "mortgagee" includes trustee.

1. If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

2. If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

a. Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. Pays any premium due under this policy on demand if you have neglected to pay the premium; and

c. Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Paragraphs E. Appraisal, G. Suit Against Us and I. Loss Payment under Section I – Conditions also apply to the mortgage.

3. If we pay the mortgagee for any loss and deny payment to you:

a. We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. At our option, we may pay to the

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

employees". As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2. To a person off the "insured location", if the "bodily injury":

   a. Arises out of a condition on the "insured location" or the ways immediately adjoining;

   b. Is caused by the activities of an "insured";

   c. Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

   d. Is caused by an animal owned by or in the care of an "insured".

## SECTION II – EXCLUSIONS

### A. "Motor Vehicle Liability"

1. Coverages E and F do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence", the involved "motor vehicle":

   a. Is registered for use on public roads or property;

   b. Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be used at the place of the "occurrence"; or

   c. Is being:

      (1) Operated in, or practicing for, any pre-arranged or organized race, speed contest or other competition, but does not include a "motor vehicle" designed for recreational use:

         (a) Not owned by an "insured"; or

         (b) Owned by an "insured" provided the "occurrence" takes place on an "insured location" as defined in **Definitions B. 6.a., b., d., e. or h.**;

      (2) Rented to others;

      (3) Used to carry persons or cargo for a charge; or

      (4) Used for any "business" purpose except for a motorized golf cart while on a golfing facility.

2. If Exclusion **A.1.** does not apply, there is still no coverage for "motor vehicle liability" unless the "motor vehicle" is:

   a. In dead storage on an "insured location";

   b. Used to service an "insured's" residence;

   c. Designed to assist the handicapped and, at the time of an "occurrence", it is:

      (1) Being used to assist a handicapped

person; or

      (2) Parked on an "insured location";

   d. Designed for recreational use off public roads and:

      (1) Not owned by an "insured"; or

      (2) Owned by an "insured" provided the "occurrence" takes place on an "insured location" as defined in **Definitions B. 6.a., b., d., e. or h.**; or

   e. A motorized golf cart that is owned by an "insured" and, at the time of an "occurrence", is within the legal boundaries of a golfing facility and is parked or stored there, or being used by an "insured" to:

      (1) Play the game of golf or for other recreational or leisure activity allowed by the facility;

      (2) Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

      (3) Cross public roads at designated points to access other parts of the golfing facility.

### B. "Watercraft Liability"

1. Coverages E and F do not apply to any "watercraft liability" if, at the time of an "occurrence", the involved watercraft is being used for any "business" purpose.

2. If Exclusion **B.1.** does not apply, there is still no coverage for "watercraft liability" unless, at the time of the "occurrence", the watercraft:

   a. Is stored;

   b. Is a sailing vessel, with or without auxiliary power, that is:

      (1) Less than 26 feet in overall length; or

      (2) 26 feet or more in overall length and not owned by or rented to an "insured"; or

   c. Is not a sailing vessel and is powered by:

      (1) An inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

         (a) 50 horsepower or less; or

         (b) More than 50 horsepower and not owned by or rented to an "insured"; or

      (2) One or more outboard engines or motors with:

         (a) 25 total horsepower or less;

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

4. Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

5. If we decide to cancel this policy, the mortgagee will be notified in writing at least 10 days before the date cancellation takes effect.

6. If we decide not to renew this policy, the mortgagee will be notified in writing at least 30 days before the date nonrenewal takes effect.

7. We will mail the notice of cancellation or nonrenewal to the mortgagee by registered or certified mail, or by certificate of mailing, for which we will obtain a written receipt from the United States Postal Service showing your name and address as shown in the Declarations. We will retain a copy of the notice.

**L. No Benefit To Bailee**

We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

**M. Nuclear Hazard Clause**

1. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

2. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

3. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**N. Recovered Property**

If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

**O. Volcanic Eruption Period**

One or more volcanic eruptions that occur within a

72 hour period will be considered as one volcanic eruption.

**P. Policy Period**

This policy applies only to loss which occurs during the policy period.

**Q. Concealment Or Fraud**

We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

1. Intentionally concealed or misrepresented any material fact or circumstance;

2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

**R. Property Insurance Adjustment**

The limit of liability shown on the Policy Declarations for Coverage A – Dwelling may be revised at each policy anniversary for inflation. Any other limits of liability that are based on a relationship to Coverage A will also be revised. We will not reduce the limit of liability shown on the Policy Declarations without your consent. Any adjustment in premium will be made based on premium rates in use by us at the time the change is made.

**S. Loss Clause**

Payment of loss will not reduce the amount of this insurance.

**SECTION II – LIABILITY COVERAGES**

**A. Coverage E – Personal Liability**

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which an "insured" is legally liable; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

**B. Coverage F – Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

      **(b)** More than 25 horsepower if the outboard engine or motor is not owned by an "insured";

      **(c)** More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period; or

      **(d)** More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

        **(i)** You declare them at policy inception; or

        **(ii)** Your intent to insure them is reported to us in writing within 45 days after you acquire them.

The coverages in **(c)** and **(d)** above apply for the policy period.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

**C.** **"Aircraft Liability"**

This policy does not cover "aircraft liability".

**D.** **Coverage E – Personal Liability And Coverage F – Medical Payments To Others**

Coverages E and F do not apply to the following:

**1.** **Expected Or Intended Injury**

"Bodily injury" or "property damage" which is expected or intended by an "insured", or which is the result of intentional acts or omissions, even if the resulting "bodily injury" or "property damage":

    **a.** Is of a different kind, quality or degree than initially expected or intended; or

    **b.** Is sustained by a different person, entity or property than initially expected or intended.

This exclusion applies regardless of whether an "insured" is charged with or convicted of a crime. However, this Exclusion **D.1.** does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force by an "insured" to protect persons or property;

**2.** **"Business"**

    **a.** "Bodily injury" or "property damage" arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured".

This Exclusion **D.2.** applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

    **b.** This Exclusion **D.2.** does not apply to:

      **(1)** The rental or holding for rental of an "insured location";

        **(a)** On an occasional basis if used only as a residence;

        **(b)** In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

        **(c)** In part, as an office, school, studio or private garage; or

      **(2)** Activities which are ordinarily incident to non-business pursuits. Coverage is provided for incidental business activities of an "insured" for babysitting, caddying, lawn care, newspaper delivery and other similar activities;

**3.** **Professional Services**

"Bodily injury" or "property damage" arising out of the rendering of or failure to render professional services;

**4.** **"Insured's" Premises Not An "Insured Location"**

"Bodily injury" or "property damage" arising out of a premises:

    **a.** Owned by an "insured";

    **b.** Rented to an "insured"; or

    **c.** Rented to others by an "insured";

that is not an "insured location";

**5.** **War**

"Bodily injury" or "property damage" caused directly or indirectly by war, including the following and any consequence of any of the following:

    **a.** Undeclared war, civil war, insurrection, rebellion or revolution;

    **b.** Warlike act by a military force or military personnel; or

    **c.** Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

**6.** **Communicable Disease**

"Bodily injury" or "property damage" which arises out of the transmission of or exposure to

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

a communicable disease, bacteria, parasite, virus or other organism by an "insured";

**7. Sexual Molestation, Corporal Punishment Or Physical Or Mental Abuse**

"Bodily injury" or "property damage" arising out of sexual molestation, corporal punishment or physical or mental abuse;

**8. Controlled Substance**

"Bodily injury" or "property damage" arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed health care professional with prescriptive authority for controlled substances;

**9. Home Day Care**

"Bodily injury" or "property damage" arising out of home day care services provided by an "insured" and for which an "insured" receives monetary or other compensation, not including the mutual exchange of such services or the rendering of home day care services to a relative of an "insured";

Exclusions A. "Motor Vehicle Liability", B. "Watercraft Liability", C. "Aircraft Liability" and D.4. "Insured's" Premises Not An "Insured Location" do not apply to "bodily injury" to a "residence employee" arising out of and in the course of the "residence employee's" employment by an "insured".

**E. Coverage E – Personal Liability**

Coverage E does not apply to:

**1. Liability:**

a. For any loss assessment charged against you as a member of an association, corporation or community of property owners, except as provided in D. Loss Assessment under Section II – Additional Coverages;

b. Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

    **(1)** That directly relate to the ownership, maintenance or use of an "insured location"; or

    **(2)** Where the liability of others is assumed by you prior to an "occurrence";

unless excluded in a. above or elsewhere in this policy;

**2.** "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";

**3.** "Property damage" to property rented to, occupied or used by or in the care of an "insured". This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

**4.** "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

a. Workers' compensation law;

b. Non-occupational disability law; or

c. Occupational disease law;

**5.** "Bodily injury" or "property damage" for which an "insured" under this policy:

a. Is also an insured under a nuclear energy liability policy issued by the:

    **(1)** Nuclear Energy Liability Insurance Association;

    **(2)** Mutual Atomic Energy Liability Underwriters;

    **(3)** Nuclear Insurance Association of Canada;

    or any of their successors; or

b. Would be an insured under such a policy but for the exhaustion of its limit of liability; or

**6.** "Bodily injury" to you or an "insured" as defined under Definition 5.a.

This exclusion also applies to any claim made or suit brought against you or an "insured":

a. To repay; or

b. Share damages with;

another person who may be obligated to pay damages because of "bodily injury" to an "insured".

**F. Coverage F – Medical Payments To Others**

Coverage F does not apply to "bodily injury":

**1.** To a "residence employee" if the "bodily injury":

a. Occurs off the "insured location"; and

b. Does not arise out of or in the course of the "residence employee's" employment by an "insured";

**2.** To any person eligible to receive benefits voluntarily provided or required to be provided under any:

a. Workers' compensation law;

b. Non-occupational disability law; or

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

## D. Nonrenewal

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice, together with our reasons for nonrenewal, at least 30 days before the expiration date of this policy. We will mail the nonrenewal notice to you by registered or certified mail, or by certificate of mailing, for which we will obtain a written receipt from the United States Postal Service showing your name and address as shown in the Declarations. We will retain a copy of the notice.

## E. Assignment

Assignment of this policy will not be valid unless we give our written consent.

## F. Subrogation

An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply to Coverage F or Paragraph C. Damage To Property Of Others under Section II – Additional Coverages.

## G. Death

If any person named in the Declarations or the spouse, if a resident of the same household, dies, the following apply:

1. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death; and

2. "Insured" includes:

   a. An "insured" who is a member of your household at the time of your death, but only while a resident of the "residence premises"; and

   b. With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

## H. Coverage Changes

The coverage provided and the premium for the policy is based on information you have given us. You agree to cooperate with us in determining if this information is correct and complete. You agree that if this information changes, is incorrect or incomplete, we may adjust your coverage and premium accordingly during the policy period.

## I. Continuous Policy

Subject to the consent of this Company, this policy will be continued in force upon payment of the required continuation premium for each successive policy period in accordance with the rules, rates, forms and premiums then in effect. Failure to pay the required premium when due will result in the issuance of a legal notice of cancellation.

## J. Modification Of Terms

The terms of this policy are amended to conform to the statutes, rules and regulations of the state where this policy is issued whenever the terms of this policy are less favorable to the "insured".

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

c. Occupational disease law;

3. From any:

   a. Nuclear reaction;

   b. Nuclear radiation; or

   c. Radioactive contamination;

   all whether controlled or uncontrolled or however caused; or

   d. Any consequence of any of these; or

4. To any person, other than a "residence employee" of an "insured", regularly residing on any part of the "insured location".

## SECTION II – ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

### A. Claim Expenses

We pay:

1. Expenses we incur and costs taxed against an "insured" in any suit we defend;

2. Premiums on appeal bonds required in a suit we defend; premiums on bonds to release attachments in a suit we defend, but not for bond amounts greater than the limit of liability for Coverage E; and the cost of bail bonds required of the "insured" because of an accident arising out of the use of any vehicle covered by this policy, not to exceed $250 per bail bond. We need not apply for or furnish any such bonds;

3. Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) and vacation time or other benefit loss up to $300 per day, for assisting us in the investigation or defense of a claim or suit; and

4. Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

### B. First Aid Expenses

We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to an "insured".

### C. Damage To Property Of Others

1. We will pay, at replacement cost, up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured".

2. We will not pay for "property damage":

   a. To the extent of any amount recoverable under Section I;

   b. Caused intentionally by an "insured" who is

13 years of age or older;

c. To property owned by an "insured";

d. To property owned by or rented to a tenant of an "insured" or a resident in your household; or

e. Arising out of:

   (1) A "business" engaged in by an "insured";

   (2) Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or

   (3) The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, watercraft or "motor vehicles".

   This exclusion e.(3) does not apply to:

   (a) A snowmobile, golf cart; or

   (b) A "motor vehicle" that:

      (i) Is designed for recreational use off public roads; and

      (ii) At the time of the "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used on public roads or property.

### D. Loss Assessment

1. We will pay up to $1,000 for your share of loss assessment charged against you, as owner or tenant of the "residence premises", during the policy period by a corporation or association of property owners, when the assessment is made as a result of:

   a. "Bodily injury" or "property damage" not excluded from coverage under Section II – Exclusions; or

   b. Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided such person:

      (1) Is elected by the members of a corporation or association of property owners; and

      (2) Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

2. Paragraph I. Policy Period under Section II – Conditions does not apply to this Loss Assessment Coverage.

3. Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

4. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

## SECTION II – CONDITIONS

### A. Limit Of Liability

Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the Coverage E limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence".

Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage F limit of liability shown in the Declarations.

### B. Severability Of Insurance

This insurance applies separately to each "insured". This condition will not increase our limit of liability for any one "occurrence".

### C. Duties After "Occurrence"

In case of an "occurrence", you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

1. Give written notice to us or our agent as soon as is practical, which sets forth:

    a. The identity of the policy and the "named insured" shown in the Declarations;

    b. Reasonably available information on the time, place and circumstances of the "occurrence"; and

    c. Names and addresses of any claimants and witnesses;

2. Cooperate with us in the investigation, settlement or defense of any claim or suit;

3. Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

4. At our request, help us:

a. To make settlement;

b. To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

c. With the conduct of suits and attend hearings and trials; and

d. To secure and give evidence and obtain the attendance of witnesses;

5. With respect to C. Damage To Property Of Others under Section II - Additional Coverages, submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in an "insured's" control;

6. No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

### D. Duties Of An Injured Person – Coverage F – Medical Payments To Others

1. The injured person or someone acting for the injured person will:

    a. Give us written proof of claim, under oath if required, as soon as is practical; and

    b. Authorize us to obtain copies of medical reports and records.

2. The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

### E. Payment Of Claim – Coverage F – Medical Payments To Others

Payment under this coverage is not an admission of liability by an "insured" or us.

### F. Suit Against Us

1. No action can be brought against us unless there has been full compliance with all of the terms under this Section II.

2. No one will have the right to join us as a party to any action against an "insured".

3. Also, no action with respect to Coverage E can be brought against us until the obligation of such "insured" has been determined by final judgment or agreement signed by us.

4. Any person or organization or their legal representative who has secured such judgment or written agreement against the "insured" shall be entitled to recover under this policy to the extent of the insurance afforded under this policy.

### G. Bankruptcy Of An "Insured"

Bankruptcy or insolvency of an "insured" or the "insured's" estate will not relieve us of our

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

obligations under this policy.

## H. Other Insurance – Coverage E – Personal Liability

If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss. However, with respect to "bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading or unloading of any motor vehicle or watercraft to which this policy applies, this insurance under Coverage E – Personal Liability shall be excess over any other valid and collectible insurance available to the "insured".

## I. Policy Period

This policy applies only to "bodily injury" or "property damage" which occurs during the policy period.

## J. Concealment Or Fraud

We do not provide coverage to an "insured" who, whether before or after a loss, has:

1. Intentionally concealed or misrepresented any material fact or circumstance;

2. Engaged in fraudulent conduct; or

3. Made false statements;

relating to this insurance.

## SECTIONS I AND II – CONDITIONS

## A. Liberalization Clause

If we adopt any revision which would broaden the coverage under this policy without additional premium, the broadened coverage will immediately apply to this policy.

## B. Waiver Or Change Of Policy Provisions

A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

## C. Cancellation

1. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

2. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice, stating the reasons for cancellation, may be delivered to you or mailed to you at your mailing address shown in the Declarations.

We will mail the cancellation notice to you by registered or certified mail, or by certificate of mailing, for which we will obtain a written receipt from the United States Postal Service

showing your name and address as shown in the Declarations. We will retain a copy of the notice.

a. When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

b. When this policy has been in effect for less than 90 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

c. When this policy has been in effect for 90 days or more, or at any time if it is a renewal with us, we may cancel for one or more of the following reasons:

(1) Conviction of a crime arising out of acts increasing the probability that a peril insured against will occur;

(2) Discovery of fraud or material misrepresentation;

(3) Willful or reckless acts or omissions increasing the probability that a peril insured against will occur as determined from a physical inspection of the insured premises;

(4) Physical changes in the property which result in the property becoming uninsurable as determined from a physical inspection of the insured premises; or

(5) Foreclosure efforts by the secured party against the subject property covered by the policy that have resulted in the sale of the property by a trustee under a deed of trust as duly recorded in the land title records of the jurisdiction in which the property is located.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

3. When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

4. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

## SECTION I – CONDITIONS

In Forms HO 3000-VA and HO 6000-VA, Paragraph **7.** under **K. Mortgage Clause** is replaced by the following:

7. We will mail the notice of cancellation or nonrenewal to the mortgagee in accordance with Virginia Law. We will retain a copy of the notice.

## SECTION I AND II – CONDITIONS

Under **C. Cancellation**, the first two paragraphs of Paragraph **2.** are replaced by the following:

2. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice, stating the reasons for cancellation, may be delivered to you or mailed to you at your mailing address shown in the Declarations.

   We will mail the cancellation notice to you in accordance with Virginia Law. We will retain a copy of the notice. Proof of mailing will be sufficient proof of notice.

Paragraph **D. Nonrenewal** is replaced by the following:

**D. Nonrenewal**

We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice, together with our reasons for nonrenewal, at least 30 days before the expiration date of this policy. We will mail the nonrenewal notice to you in accordance with Virginia Law. We will retain a copy of the notice. Proof of mailing will be sufficient proof of notice.

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

## IDENTITY THEFT RESOLUTION ASSISTANCE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

For no additional premium, the following is added to **Additional Coverages** under **SECTION I – PROPERTY COVERAGES:**

### IDENTITY THEFT RESOLUTION ASSISTANCE

We may, at our option and at our expense, refer you to a firm that:

1. you can authorize to work on your behalf to assist you in reporting and resolving "identity theft"; or

2. can consult with you on preventative and protective measures you might take if a circumstance causes you to reasonably suspect that you may become or have already become, a victim of "identity theft".

### DEFINITIONS

With respect to the provisions of this endorsement, the following definition is added:

"Identity theft" means an act or series of acts committed or attempted by a third party, using, without authority, identifying information of an "insured" to open new credit accounts or use existing credit information, whether for financial gain or to disguise the third party's true identity.

### EXCLUSIONS

1. We do not cover your loss or expenses incurred in reporting or resolving the effects of "Identity Theft".

2. We do not provide this service to any "insured" who directs or commits fraudulent, dishonest or criminal acts, alone or in concert with others, which result in "Identity theft".

### SPECIAL DEDUCTIBLE

No deductible applies to this endorsement.

All other provisions of this policy apply.

SH 23 45   08 13

## PERSONAL PROPERTY REPLACEMENT COST LOSS SETTLEMENT – VIRGINIA

**A. Eligible Property**

1. Covered losses to the following property are settled at replacement cost at the time of the loss:

   a. Coverage C; and

   b. If covered in this policy:

      (1) Awnings, outdoor antennas and outdoor equipment; and

      (2) Carpeting and household appliances;

      whether or not attached to buildings.

2. This method of loss settlement will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy and not subject to agreed value loss settlement:

   a. Jewelry;

   b. Furs and garments:

      (1) Trimmed with fur; or

      (2) Consisting principally of fur;

   c. Cameras, projection machines, films and related articles of equipment;

   d. Musical equipment and related articles of equipment;

   e. Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding:

      (1) Pens or pencils;

      (2) Flasks;

      (3) Smoking implements; or

      (4) Jewelry; and

   f. Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

   Personal Property Replacement Cost loss settlement will not apply to other classes of property separately described and specifically insured.

**B. Ineligible Property**

   Property listed below is not eligible for replacement cost loss settlement. Any loss will be settled at actual cash value at the time of loss but not more than the amount required to repair or replace.

1. Antiques, fine arts, paintings and similar articles of rarity or antiquity, which cannot be replaced.

2. Memorabilia, souvenirs, collectors items and similar articles, whose age or history contribute to their value.

3. Articles not maintained in good or workable condition.

4. Articles that are outdated or obsolete and are stored or not being used.

**C. Replacement Cost Loss Settlement Condition**

   The following loss settlement condition applies to all property described in A. above:

1. We will pay no more than the least of the following amounts:

   a. Replacement cost at the time of loss without deduction for depreciation;

   b. The full cost of repair at the time of loss;

   c. The limit of liability that applies to Coverage C, if applicable;

   d. Any applicable special limits of liability stated in this policy; or

   e. For loss to any item described in A.2.a. – f. above, the limit of liability that applies to the item.

2. If the cost to repair or replace the property described in A. above is more than $500, we will pay no more than the actual cash value for the loss until the actual repair or replacement is complete.

3. You may make claim for loss on an actual cash value basis. You may then make claim, in accordance with this endorsement, for the difference between the actual cash value and the replacement cost within six months of the later of:

   a. The last date you received a payment for actual cash value; or

   b. The date of entry of a final order of a court of competent jurisdiction declaring your right to replacement cost.

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

SH 23 48   08 13

*ADDITIONAL PERCENTAGE OF INSURANCE*
*FOR COVERAGE A – DWELLING – MAXIMUM OF 25% - VIRGINIA*
*FORM HO 3000-VA ONLY*

**(APPLIES ONLY WHEN LOSS TO BUILDING INSURED UNDER COVERAGE A EXCEEDS THE COVERAGE A LIMIT OF LIABILITY SHOWN IN THE DECLARATIONS)**

To the extent that coverage is provided, we agree to provide an additional amount of insurance in accordance with the following provisions:

A. If you have:

1. Allowed us to adjust the Coverage A limit of liability and the premium in accordance with:

   a. The property evaluations we make; and

   b. Any increases in inflation; and

2. Notified us, within 30 days of completion, of any improvements, alterations or additions to the building insured under Coverage A which increase the replacement cost of the building by 5% or more;

   The provisions of this endorsement will apply after a loss, provided you elect to repair or replace the damaged building.

   If the conditions in A.1 and 2. above are not satisfied, no insurance is available under this endorsement.

B. If there is a loss to the building insured under Coverage A that exceeds the Coverage A limit of liability shown in the Declarations, for the purpose of settling that loss only:

1. We will provide an additional amount of insurance, up to a maximum of 25% of the Coverage A.

2. **Section I – Condition C. Loss Settlement**, Paragraph 2. is deleted and replaced by Paragraphs 2., 3., and 4. as follows:

   2. The building insured under Coverage A at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts:

      a. The replacement cost of that part of the building damaged with material of like kind and quality and for like use;

   b. The necessary amount actually spent to repair or replace the damaged building; or

   c. The limit of liability under this policy that applies to the building, plus any additional amount provided by this endorsement.

   If the building is rebuilt at a new premises, the cost described in a. above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

   3. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

   4. You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to the building on an actual cash value basis. You may then make claim, in accordance with the provisions of this Condition **C. Loss Settlement**, for the difference between the actual cash value and the replacement cost of the building within six months of the later of:

      a. The last date you received a payment for actual cash value; or

      b. The date of entry of a final order of a court of competent jurisdiction declaring your right to replacement cost.

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

# *LIMITED WATER BACK-UP AND SUMP DISCHARGE OR OVERFLOW COVERAGE – VIRGINIA*

---

| |
|---|
| **Limit of Liability:** |
| |
| **Deductible:** |

*Entry may be left blank if shown elsewhere in this policy for this coverage.

## A. Coverage

We will pay up to the limit of liability shown in the Schedule for direct physical loss to property covered under Section I caused by water which:

1. Backs up through sewers or drains; or
2. Overflows or is discharged from a:
   a. Sump, sump pump; or
   b. Related equipment;

   even if such overflow or discharge results from mechanical breakdown. This coverage does not apply to direct physical loss of the sump pump, or related equipment, which is caused by mechanical breakdown.

This coverage does not increase the limits of liability for Coverages A, B, C or D stated in the Declarations.

## B. Section I – Perils Insured Against

With respect to the coverage described in **A.** above, Paragraph:

**A.2.b.(6)(b)** in Form HO 3000-VA;

**1.b.(4)(b)** in Form HO 3000-VA with SH 00 20;

**3.I.(2)** in Endorsement SH 17 40; and

**2.b.(6)(b)** in Endorsement SH 17 41;

is deleted and replaced by the following:

Latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

## C. Special Deductible

The following replaces any other deductible provision in this policy with respect to loss covered under this endorsement.

We will pay only that part of the total of all loss payable under Section I that exceeds the deductible shown in the Schedule. No other deductible applies to this coverage. This deductible does not apply with respect to Coverage D – Loss of Use.

## D. Section I – Exclusions

With respect to the coverage provided under this endorsement, the **Water Exclusion** is replaced by the following:

**Water**

This means water which backs up through sewers or drains, or overflows or is discharged from a sump, sump pump or related equipment, as a direct or indirect result of:

a. Flood, surface water, waves, including tidal wave and tsunami, tides, tidal water, overflow of any body of water, or spray from any of these, all whether or not driven by wind, including storm surge; or

b. Water below the surface of the ground, regardless of its source, including water which exerts pressure on, or seeps, leaks or flows through a building, sidewalk, driveway, patio, foundation, swimming pool or other structure.

This Exclusion applies regardless of whether any of the above, in Paragraphs **a.** and **b.**, is caused by an act of nature or is otherwise caused.

However, direct physical loss by fire, explosion or theft resulting from any of the above, in Paragraphs **a.** and **b.**, is covered.

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

Grantor: SINGH, ⬛ WINDER    Grantee: PRLAP, INC
DateTime: 03/25/2008 13;44 09    Instrument: 2008007559 003
Book/Page: 19648/0228    # of Pages: 20
Recorded in FAIRFAX CIRCUIT COURT

TESTE: JOHN T. FREY

After Recording Return To:
Bank of America, N.A.
ATTN: Construction
9000 Southside Blvd., Ste 700
Jacksonville, FL 32256
Parcel ID: 013-1-01-0028-A

Prepared By:
Robertson & Anschutz
10333 Richmond Avenue, Suite 550
Houston, TX 77042

Please return to:-
EXPRESS TITLE SERVICES, INC.
10400 EATON PLACE, SUITE 106,
FAIRFAX, VA 22030

## DEED OF TRUST

Loan No. 6840999566

The following information, as further defined below, is provided in accordance with Virginia law:

This Deed of Trust is given by Palwinder Singh and ~~Mandeep Kaur Gill,~~ husband and wife, as Borrower (trustor), to PRLAP, Inc., as Trustee, for the benefit of Bank of America, N.A., as beneficiary.

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)     "Security Instrument" means this document, which is dated March 18, 2008, together with all Riders to this document.
(B)     "Borrower" is Palwinder Singh and ~~Mandeep Kaur Gill,~~ husband and wife. Borrower is the trustor under this Security Instrument.
(C)     "Lender" is Bank of America, N.A.. Lender is a National Association organized and existing under the laws of the United States of America. Lender's address is P.O. Box 9000, Getzville, NY 14068-9000. Lender is the beneficiary under this Security Instrument.
(D)     "Trustee" is PRLAP, Inc.. Trustee (whether one or more persons) is a Virginia resident and/or a United States- or Virginia-chartered corporation whose principal office is located in Virginia. Trustee's address is c/o 1400 Best Plaza Drive, Richmond, VA 23227.
(E)     "Note" means the promissory note signed by Borrower and dated March 18, 2008. The Note states that Borrower owes Lender Eight Hundred Forty-Two Thousand Eighty Dollars (U.S. $842,080.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 01, 2038. The interest rate stated in the Note is Seven and Three Quarters percent (7.750%). If this Security Instrument is an adjustable rate mortgage loan, this initial rate is subject to change in accordance with the attached Adjustable Rate Rider.
(F)     "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G)     "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H)     "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider          [X] Construction Loan Rider

(I)     "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J)     "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K)     "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                              (Page 1 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007



610   870221373   D2   001   001

PLAINTIFF'S
EXHIBIT
B

Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)     "Escrow Items" mean those items that are described in Section 3.

(M)     "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)     "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)     "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)     "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)     "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Fairfax:

     **See Exhibit "A" attached hereto and made a part hereof for all purposes**

which has the address of 817 Walker Road, Great Falls, VA 22066 ("Property Address");

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

     UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

     1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

     Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                              (Page 2 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                         (Page 3 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                                                          (Page 4 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to:

VIRGINIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                (Page 5 of 11 Pages)
(DoD) RA0221360 – si3000.va – Rev. 07/26/2007

(a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                                          (Page 6 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security

VIRGINIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                                                                (Page 7 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.    Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.  Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means.  Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

VIRGINIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047  1/01                                    (Page 8 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                                           (Page 9 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01 (Page 10 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
**Palwinder Singh**                                        -Borrower


X _____ (Seal)
~~Mandeep Kaur Gill~~

STATE OF VIRGINIA, _____Fairfax_____ County

The foregoing instrument was acknowledged before me this _March 18ᵗʰ 08_, by **Palwinder Singh** and Mandeep Kaur Gill.

_____
Notary Public

Notary Registration Number: _365866_

_Anshum Sapra Closer_
Name and title

My commission expires: _8-31-09_

```
^^^^^^^^^^^^^^^^^^^^^^^^
      ANSHUM SAPRA
       Notary Public
       ID - 365666
   Commonwealth of Virginia
My Commission Expires 03/31/2009
vvvvvvvvvvvvvvvvvvvvvvvv
```

VIRGINIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3047 1/01                              (Page 11 of 11 Pages)
(DoD) RA0221360 - si3000.va - Rev. 07/26/2007

**EXHIBIT A**
**LEGAL DESCRIPTION**

Number: 08-800

PARCEL A, CONTAINING 2.00 ACRES, MORE OR LESS, PROPERTY OF JOHN C. MOUAT, AS THE SAME APPEARS DULY PLATTED AND RECORDED IN DEED BOOK No. 3988, PAGE 498, OF THE LAND RECORDS OF FAIRFAX COUNTY.

TOGETHER WITH THE RIGHT TO USE IN CONJUNCTION WITH OTHERS, AND SUBJECT TO A THIRTY FOOT (30) FOOT OUTLET EASEMENT AS SHOWN ON SAID PLAT, SAID OUTLET EASEMENT IS ONLY FOR THE USE OF PARCELS A AND B.

KNOWN AS : 817 WALKER ROAD, GREAT FALLS, VA 22066.

AND BEING THE SAME PROPERTY CONVEYED UNTO THE GRANTOR(S), UNDER SUBSTITUTE TRUSTEE'S DEED DATED DECEMBER 17, 2007 AND RECORDED ON DECEMBER 19, 2007, IN DEED BOOK 19710 PAGE 623, AMONG THE AFORESAID LAND RECORDS.

12

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this **Eighteenth** day of **March, 2008**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Bank of America, N.A.** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**817 Walker Road
Great Falls, VA 22066**
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES IN THE INTEREST
RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE INTEREST
RATE WILL RESULT IN LOWER PAYMENTS.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 7.750%. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A)    Change Dates**
   The interest rate I will pay may change on the **First** day of **April, 2013**, and on that day every **Twelfth** month thereafter. Each date on which my interest rate could change is called a "Change Date."

   **(B)    The Index**
   Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
   If the Index is no longer available, the Note Holder will choose a new Index which is based upon comparable information. The Note Holder will give me notice of this choice.

   **(C)    Calculation of Changes**
   Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and One Quarter** percentage point(s) ( 2.250% ) to the Current Index. The Note Holder will then round the result of this addition to the next highest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
   The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
   The "Interest-Only Period" is the period from the date of this Note to April 1, 2018. For the Interest-Only Period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.
   The "Amortization Period" is the period after the Interest-Only Period. For the Amortization Period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full

MULTISTATE ADJUSTABLE RATE RIDER -Single Family
BS899R (0101).03
(R&A) RA0221360 - rd899.bax - Rev. 04/26/2006            Page 1 of 4

13

Case 1:21-cv-00207-TDS-JEP   Document 7-1   Filed 04/06/21   Page 60 of 100

on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

      **(D)    Limits on Interest Rate Changes**
      My interest rate will never be greater than **12.750%**, which is called the "Maximum Rate."
      The interest rate I am required to pay at the first Change Date will not be greater than **12.750%** or less than **2.750%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **Two** percentage points ( **2.000%** ) from the rate of interest I have been paying for the preceding period.

      **(E)    Effective Date of Changes**
      My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

      **(F)    Notice of Changes**
      The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.     TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

      **(1)    WHEN MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION B(2) BELOW SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

          **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

          If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

          To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

          If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the

**MULTISTATE ADJUSTABLE RATE RIDER -Single Family**
B8889R (0101).03
(R&A) RA0221360 - rd899.bax - Rev. 04/26/2005       Page 2 of 4

H

expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(2)    UNTIL MY INITIAL FIXED INTEREST RATE CHANGES TO AN ADJUSTABLE INTEREST RATE UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL READ AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER -Single Family
BS899R (0101).03
(R&A) RA0221360 - rd899.bxx - Rev. 04/26/2006                Page 3 of 4

Case 1:21-cv-00207-TDS-JEP   Document 7-1   Filed 04/06/21   Page 62 of 100

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Palwinder Singh                                  -Borrower


_____ (Seal)
Mandeep Kaur Gill

**MULTISTATE ADJUSTABLE RATE RIDER -Single Family**
BS899R (0101).03
(R&A) RA0221360 - rd899.bax - Rev. 04/26/2006          Page 4 of 4

16

Loan No.: 6840999566

# CONSTRUCTION LOAN RIDER TO SECURITY INSTRUMENT

THIS CONSTRUCTION LOAN RIDER TO SECURITY INSTRUMENT (this "Rider") is made this **Eighteenth** day of **March, 2008**, and amends the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to **Bank of America, N.A.** (the "Lender") of the same date and covering the property described in the Security Instrument (the "Property") and located at: **817 Walker Road, Great Falls, VA 22066.**

## ADDITIONAL COVENANTS

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Terms defined in the Note shall have the same meaning in this Rider to the Security Instrument.

**A.     INCORPORATION OF RESIDENTIAL CONSTRUCTION LOAN AGREEMENT**
        Lender and Borrower entered into a Residential Construction Loan Agreement (the "Agreement") of even date herewith.  The Agreement is incorporated herein by reference.  A default under the terms of the Agreement shall constitute a default under the terms of the Security Instrument.

**B.     CONSTRUCTION MORTGAGE**
        The Security Instrument is securing the obligation for the cost of construction of certain improvements on the Property.  The Security Instrument is a "Construction Mortgage" under the Uniform Commercial Code as adopted and applied in the state where the Property is situated.  It is understood and agreed that funds to be advanced under the Note are to be used in the construction of certain improvements on the Property in accordance with the Agreement.

**C.     FUTURE ADVANCES**
        The Security Instrument is given to secure future obligations under the Note.  The face amount of obligations evidenced by the Note and secured hereunder is     **$842,080.00**     and the maximum amount, including present as well as future advances evidenced by the Note, which Lender shall be obligated to advance, shall not exceed the face amount of the Note; provided however, the said maximum amount may be increased by such additional amounts as may be advanced, by Lender pursuant to the Security Instrument and all such additional amounts shall be deemed necessary expenditures for the protection of the security in accordance with and to the extent allowed by applicable law.

**D.     WAIVER OF CERTAIN NOTICES DURING CONSTRUCTION**
        Notwithstanding the 30 day written notice and right to cure provisions contained in Section 22 of the Security Instrument, prior to the Rollover Date (or agreed written extension thereof), the Borrower, as well as all sureties, guarantors and endorsers of said Note severally waive all notices, demands, presentments for payment, notices of non-payment, notices of intention to accelerate the maturity, notices of acceleration, notices of dishonor, protest and notice of protest, diligence in collecting or bringing suit as to the Note and as to each, every and all installments thereof and all obligations thereunder and against any party thereto and to the application of any payment on said obligation, or as an offset thereto, and agree to all extensions, renewals, partial payments, substitutions or evidence of indebtedness and the taking, release or substitution of all or any part of the herein described security or the release of any party liable thereon with or without notice before or after maturity.

**E.     SECURITY AGREEMENT**
        Without limiting any of the provisions of the Security Instrument, Borrower, as Debtor (and being referred to in this paragraph as "Debtor," whether one or more), expressly GRANTS unto Lender, as Secured Party (and being referred to in this paragraph as "Secured Party," whether one or more), a security interest in the following described property (including both those now and those hereafter existing).  The definition of Property is hereby expanded to include:

(R&A) RA0221360 - rdconstal box - Rev. 07/03/2006          Page 1

IX

(1) All fixtures, furnishings, equipment, building material and machinery now or hereafter located in, on, or used or intended to be used in connection with the Property, including without limitation: doors, partitions; window and floor coverings; apparatus, material, or equipment for supplying, holding, or distributing heating, cooling, electricity, gas, water, air, and lighting; security, access control, and fire prevention and extinguishing apparatus, material, or equipment; bathroom and kitchen fixtures; cabinetry; and landscaping. (2) All proceeds or sums payable in lieu of or as compensation for the loss of or damage to the Property and the fixtures and personal property, and all rights in and to all present and future fire and hazard insurance policies. (3) All proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking, in whole or in part, of the Property, or for conveyance in lieu thereof.

**F.    DEFAULT**
Covenants contained in Section Nos. 18, 19, and 22 of the Security Instrument are hereby suspended during the continuance of this Rider only, and the following substituted in lieu thereof:

In the event any of the following events or conditions occur or exist, each such event or condition shall be a default hereunder entitling Lender to declare the entire indebtedness hereby secured immediately due and payable:

(1)    Any lien, inferior or superior to the lien of this Security Instrument, is created, permitted or filed against the Property, or any portion thereof, without Lender's prior written consent, except current ad valorem taxes which are not then due and payable.

(2)    The sale, assignment or other transfer, voluntarily or involuntarily, of all or a part of Borrower's ownership interest in the Property, or any portion thereof, directly or indirectly, is made without Lender's prior written consent.

(3)    Borrower fails to comply with the terms and conditions of the Note, the Security Instrument or the Agreement.

Upon default, Lender, at its option, may require immediate payment in full of all sums secured by the Security Instrument without demand and may invoke the power of sale and any other remedies permitted by applicable law. However, this option to require immediate payment in full shall not be exercised if such exercise is prohibited by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in the Security Instrument including, but not limited to, reasonable attorney's fees and costs of title evidence.

Upon the termination of the provisions of this Rider as set forth below, Covenants contained in Section Nos. 18, 19, and 22 of the Security Instrument shall be reinstated so that they shall then be in full force and effect.

**G.    TERMINATION OF CONSTRUCTION LOAN RIDER**
So long as Borrower is not in default under the terms of the Note, the Agreement, or the Security Instrument, and so long as Borrower has completed the improvements described in the Agreement, this Rider shall terminate on the Rollover Date as defined in the Construction Loan Addendum to Note, and shall thereafter no longer be in effect.

Debtor's Mailing Address:
**2262 Stonewheel Drive**
**Herndon, VA 20191**

(R&A) RA0221360 – rdocmstd box – Rev. 07/03/2006                    Page 2

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Construction Loan Rider to Security Instrument and Security Agreement.

_____ (Seal)
**Palwinder Singh**                                        -Borrower


_____ (Seal)
**Mandeep Kaur Gill**

19

This Document Was Prepared By
And after recording return to:
Slugg & Associates, PLC
Attorneys at Law
5246 Lyngate Court
Burke, Virginia 22015
Case # 0711062
REO # 0100447010

## SPECIAL WARRANTY DEED

THIS DEED, made this $\cancel{2}$ day of February 2008, by and between **AVELO MORTGAGE, LLC**, hereinafter referred to as "Grantor", party of the first part; and **PALWINDER SINGH**, husband and wife, hereinafter referred to collectively as "Grantee", party of the second part.

THAT for and in consideration of the sum of Ten Dollars ($10.00) cash, one to the other in hand paid, the consideration received therefore by the Grantor for the conveyance made hereby, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor, subject to the matters described herein, does hereby grant, bargain, sell and convey to the Grantee, in fee simple, and with SPECIAL WARRANTIES OF TITLE, all that certain lot or parcel of land, together with the improvements thereon and appurtenances thereunto, situate and being in the County of Fairfax, Commonwealth of Virginia, having an address of 817 Walker Road, Great Falls, Virginia, and being more particularly described as follows, to-wit:

ALL THAT CERTAIN LOT OR PARCEL OF LAND SITUATE IN THE COUNTY OF FAIRFAX, COMMONWEALTH OF VIRGINIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PARCEL A, CONTAINING 2.00 ACRES, MORE OR LESS, PROPERTY OF JOHN C. MOUAT, AS THE SAME APPEARS DULY PLATTED AND RECORDED IN DEED BOOK NO. 3896, PAGE 495, OF THE LAND RECORDS OF SAID COUNTY.

TOGETHER WITH THE RIGHT TO USE IN CONJUNCTION WITH OTHERS, AND SUBJECT TO A THIRTY FOOT (30) FOOT OUTLET EASEMENT AS SHOWN ON SAID PLAT, SAID OUTLET EASEMENT IS ONLY FOR THE USE OF PARCELS A AND B.

AND BEING the same property conveyed to Grantor herein by virtue of a Substitute Trustee's Deed dated December 17, 2007 and recorded among the land records of Prince William County, Virginia.

This conveyance is made subject to the conditions, restrictions, easements and rights-of-way found in the Deeds and other documents forming the chain of title.

| | |
|---|---|
| **Assessed Value:** | ~~$1,180,130.00~~ $1,148,660 |
| **Consideration:** | ~~$,000.00~~ $679,000.00 |
| **Tax Map#/G-PIN:** | 013-1-01-0028-A |
| **Title Insurer:** | Chicago Title Insurance Company |
| **Grantee's Address:** | 817 WALKER ROAD |
| | GREAT FALLS VA 22066 |

Page 1 of 2



PLAINTIFF'S EXHIBIT
C
tabbies

GRANTOR covenants that it has the right to convey the subject property; that it has performed no act to encumber the same; that the Grantee shall have quiet possession thereof; and that Grantor shall execute such further assurances of title as may be requisite.

WITNESS the following Signatures and Seals:

AVELO MORTGAGE, LLC,
*BY BRIGHTON REAL ESTATE SERVICES, ITS*
*ATTORNEY IN FACT*

_____(SEAL)
By: _____
Its: VP _____

Attest
by: _____
    Secretary/Assistant Secretary

STATE OF Utah _____,

COUNTY OF Salt Lake _____, to-wit:

I certify that on this 21st day of February 2008, before me, the subscriber, a Notary Public of the State aforesaid, personally appeared Anni Parthus, VICE PRESIDENT, of Brighton Real Estate Services, as attorney in fact for Avelo Mortgage, LLC, whose name is subscribed to the within instrument, and acknowledged the foregoing deed to be his/her act under the authority of the Grantor and also certify, under penalties of perjury, that he/she is duly authorized to executed same and that the consideration recited herein is true and correct.

ANNE McGRAIL
NOTARY PUBLIC • STATE OF UTAH
6277 OAK ACORN COURT
WEST JORDAN UT 84084
My Comm. Exp. 04/03/2011

_____
Notary Public

My Commission Expires: 06-05-2011 _____

Page 2 of 2

03/25/2008

Consideration $.00
Tax Map Reference No: 0131010028A
Deed Book/ Page: 19848/0225
Title Insurance Underwriter: Unknown to preparer
Prepared without benefit of Title Examination
Grantee Address: 817 Walker Road Great Falls, VA 22066
**RETURN TO After Recording**
Palwinder Singh 817 Walker Road
Great Falls, VA 22066

Document Prepared By:
**Gary D. Weinstein Esq.**
**1513 King Street**
**Alexandria, VA 22030**
**VA Bar No: 8378**
File No. **DEEDS**

**This Deed of Gift**, made this 1st day of December, 2015, by and between
PALWINDER SINGH, of Great Falls, Virginia, USA. Party of the first part ("Grantor"); and of
PALSATA, Trust, and trustees of a revocable inter vivos trust party of the second part
("Grantee")

## -Witnesseth-

**As a Gift, and not for consideration**, the Grantors do hereby grant,
bargain, sell and convey, in fee simple, with GENERAL WARRANTY and English Covenants of
title, unto the Grantee, as sole owner all the following-described lot or parcel of land together
with improvements thereon, situate, lying and being in the :

> Parcel A, Containing 2.00 Acres, more or less Property of John G.
> Mouat as the same appears duly Platted and recorded in Deed
> Book No.3986, Page No.495, of the Land Records of Fairfax
> County.
> Together with the right to use in conjunction with others, and
> subject to a thirty foot (30) foot outlet easement as shown on said
> Plat, said outlet easement is only for the use of parcels A and B.
> Known as 817 Walker Road, Great Falls, VA 22066
> And BEING THE SAME PROPERTY CONVEYED UNTO THE
> GRANTORS, UNDER SUBSTITUTE TRUSTEE'S DEED
> DATED DECEMBER 17, 2007 AND RECORDED ON
> DECEMBER 19, 2007, IN DEED BOOK 19710 PAGE 623,
> AMONG THE AFORESAID LAND RECORDS.

For Information: Street Address: 817 Walker Road
Great Falls, VA 22066

1



**PLAINTIFF'S EXHIBIT**
D
tabbies

This Deed is exempt from recordation taxes pursuant to Code of Virginia, Section 58.1-811(D), as amended.

**This conveyance** is made expressly subject to the easements, conditions, restrictions, and rights-of-way of record contained in the instruments forming the chain of title to the property conveyed herein and to matters visible upon inspection.

**The said Grantor** covenant that he has the right to convey the said land to the said Grantee; that they have done no act to encumber the same; that the said Grantee shall have quiet possession of the said land, free from all encumbrances except mentioned herein; and that they, the said Grantor, will execute such further assurances of the land as may be requisite.

**Witness** the following signatures and seals.

*(signature)* PALWINDER SINGH

PALWINDER SINGH (SEAL)

State of Virginia )
County of Loudoun ) to wit:

The aforegoing deed was acknowledged before me on 12/11/15 by PALWINDER SINGH.

*(signature)*
Notary Public
My commission expires 01/31/2019

[Notary seal:]
Ridhima Raja
Commonwealth of Virginia
7582672
Notary Public
My Commission Expires January 31, 2019

2

**ACKNOWLEDGEMENT AND ACCEPTANCE**

I hereby accept and acknowledge the gift from PALWINDER SINGH on December 1, 2015

Trustee PALSATA Trust

State of Virginia        )
County of Loudoun    ) to wit:

The aforegoing deed was acknowledged before me on 12/1/15 by PALWINDER SINGH

Notary Public

My commission expires 01/31/2019

M Sharma Singh
Notary Public
Commonwealth of Virginia
7654673
My Commission Expires January 31, 2019

3

12/01/2015

**Recorded Interview of: Palwinder Singh**
**Claim No.: 2005979640**
Date Of Interview: 1/3/2018
Page 1

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

Q:    Megan
A:    Palwinder Singh

1    Q:    Thank you for callin' Progressive. This is Megan. How may I help you?
2
3    A:    Yes ma'am. I just call, uh, somebody and they give me quote. I want to take insurance
4          from you guys. I want to pay the, pay you guys right now.
5
6    Q:    OK.
7
8    A:    So I, I give you quote, quote number.
9
10   Q:    Yeah. Give me one second. Let me get the right system pulled up, OK?
11
12   A:    OK.
13
14   Q:    Thank you. [pause] All right. All right. What's the quote number?
15
16   A:    24868680.
17
18   Q:    Do you know, if it's through, um, Homesite or National General?
19
20   A:    No, Home s-, home, home insurance.
21
22   Q:    I understand. But we have six different companies that we write through. Do you know if
23         it's [crosstalk] through National General or Homesite?
24
25   A:    National General.
26
27   Q:    National General? OK. Perfect. Thank you. Bear with me. [pause] All right. And this is
28         for a home that you already live in or a new home purchase?
29
30   A:    No, this is already at the home [sounds like] so they already gave me this quote.
31
32   Q:    All right. So you already live in the home. And is the home already insured?
33
34   A:    Yes, yes.
35
36   Q:    OK.
37
38   A:    They already gave me everything, everything [crosstalk].

PLAINTIFF'S
EXHIBIT
tabbies
E

**Recorded Interview of:** Palwinder Singh
**Claim No.:** 2005979640
Date Of Interview: 1/3/2018
Page 2

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

39
40    Q:    I understand. I still have to, because I'm getting the call for the first time, I still have to
41          verify the information.
42
43    A:    Oh, OK. No problem.
44
45    Q:    Bear with me. [pause] All right. Can I have you verify your name please?
46
47    A:    Palwinder, last name Singh.
48
49    Q:    OK. And what date were you wanting to make the policy effective?
50
51    A:    Uh, today.
52
53    Q:    Today? The 3rd?
54
55    A:    Yes ma'am.
56
57    Q:    All right. So let me change it, 'cause we had it to submit [sounds like] the 5th. Hold on
58          one second.
59
60    A:    No problem. That's fine. I called the guy like two times. I think he called me like
61          afternoon [sounds like] [inaudible].
62
63    Q:    I'm sorry?
64
65    A:    The guy who did, did the quote, he called back, I think noon, noon or after noon, today.
66          He's not there. I leave message and he don't answer me [sounds like].
67
68    Q:    Yeah. And we've been really, really busy too. So we're not even allowed to do phone
69          calls out when it's busy like this. We have to take only incoming calls. So even if you. . .
70
71    A:    Oh [sounds like].
72
73    Q:    . . . left a message he probably wouldn't have been able to call you back. [crosstalk] Um.
74
75    A:    That's OK. We just [RD] the payment and we just issue the [inaudible].
76
77    Q:    Sure. So this is for 817 Walker Road?
78
79    A:    Yes. Great Falls, Virginia, 22066.
80

**Recorded Interview of: Palwinder Singh**
Claim No.:  2005979640
Date Of Interview: 1/3/2018
Page 3

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD] = Recording Damage

| 81 | Q: | OK. And is the home paid off? Is there still a mortgage? |
|----|----|----|
| 82 | | |
| 83 | A: | Still mortgage. |
| 84 | | |
| 85 | Q: | OK. So let me go in here, because, um, sometimes agents, when they're doin' this, this |
| 86 | | particular policy, they don't complete the underwriting questions on the last page. . . |
| 87 | | |
| 88 | A: | Mm-hmm. |
| 89 | | |
| 90 | Q: | . . . to finalize it. So I need to go to the very last page and make sure that it's been 100 |
| 91 | | percent completed. |
| 92 | | |
| 93 | A: | OK. |
| 94 | | |
| 95 | Q: | So bear with me here. [pause] Yeah, they didn't put down that you had a mortgage |
| 96 | | company. Um, what's the name of your lender? |
| 97 | | |
| 98 | A: | I think it's, um. Uh, is it, is it [inaudible] my escrow. If I don't have it here I can call you |
| 99 | | back, you know? Maybe tomorrow? |
| 100 | | |
| 101 | Q: | Yeah. Yeah. Then we're gonna have to stop because what happens is, is that the |
| 102 | | [crosstalk]. |
| 103 | | |
| 104 | A: | No, no, please. I think, uh, I think just a minute [sounds like]. One second. |
| 105 | | |
| 106 | Q: | Yeah, [crosstalk] 'cause we're gonna need to know the name, the address, the, the |
| 107 | | [crosstalk]. . . |
| 108 | | |
| 109 | A: | Yeah, yeah [crosstalk] . . . |
| 110 | | |
| 111 | Q: | . . . the loan number. |
| 112 | | |
| 113 | A: | See if I have [sounds like]. OK. Give me one second. |
| 114 | | |
| 115 | Q: | While you're doin' that, yes, the last, the last page of questions is not completed. So, um, |
| 116 | | [crosstalk]. Do you conduct [crosstalk] any business out of the home or on the property? |
| 117 | | |
| 118 | A: | No, no, no. No business. |
| 119 | | |
| 120 | Q: | All right. Have you, have you ever had a foreclosure, repossession, judgment lien or |
| 121 | | bankruptcy in the last five years? |
| 122 | | |

**Recorded Interview of: Palwinder Singh**
Claim No.: 2005979640
Date Of Interview: 1/3/2018
Page 4

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

| | | |
|---|---|---|
| 123 | A: | No. |
| 124 | | |
| 125 | Q: | All right. Have you ever had your insurance canceled, declined, or non-renewed? |
| 126 | | |
| 127 | A: | No. |
| 128 | | |
| 129 | Q: | OK. And do you own a dog or any animal of an aggressive breed? |
| 130 | | |
| 131 | A: | No, no. He a-, he ask me s-, everything, uh, before. |
| 132 | | |
| 133 | Q: | Yeah. [crosstalk] I apologize. He didn't, he didn't fill them out then. So I have to, since |
| 134 | | they're blank, I have. . . |
| 135 | | |
| 136 | A: | Oh, oh. |
| 137 | | |
| 138 | Q: | . . . to verify them. Um [crosstalk]. . . |
| 139 | | |
| 140 | A: | I d-, I d-, I called him, then he, and he, he don't answer. Then I call the other lady. He |
| 141 | | answered every-, everything [sounds like]. |
| 142 | | |
| 143 | Q: | Yeah. They, like I said [crosstalk], they didn't, they didn't finish it in the system. So |
| 144 | | that's why I have to ask it to finalize. |
| 145 | | |
| 146 | A: | No problem, no problem. Then what's gonna be the insurance [sounds like] [inaudible]? |
| 147 | | |
| 148 | Q: | OK. |
| 149 | | |
| 150 | A: | [inaudible] |
| 151 | | |
| 152 | Q: | And have you ever had or owned a dog that, where you had a liability quote? Or liability |
| 153 | | claim. . . |
| 154 | | |
| 155 | A: | I don't have a d-, no, no, no. No five year [sounds like], nothing. |
| 156 | | |
| 157 | Q: | OK. And does your home have any electrical system like a knob-and-tube or aluminum |
| 158 | | wiring? |
| 159 | | |
| 160 | A: | I mean, I have everything electrical, in elec-, electrical box. I don't know what you're |
| 161 | | talking about. What does that mean? [crosstalk] |
| 162 | | |
| 163 | Q: | Will you doing any farming on the property? |
| 164 | | |

**Recorded Interview of:** Palwinder Singh
**Claim No.:** 2005979640
**Date Of Interview:** 1/3/2018
**Page 5**

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD] = Recording Damage

| | | |
|---|---|---|
| 165 | A: | Say again? |
| 166 | | |
| 167 | Q: | Will you be doing any farming on the property? |
| 168 | | |
| 169 | A: | Oh, no, no. I not do anything. Any- [sounds like]. |
| 170 | | |
| 171 | Q: | All right. |
| 172 | | |
| 173 | A: | [crosstalk] I not do anything with purpose for [inaudible]. Uh, home, or, or, [inaudible] |
| 174 | | not inside. Nothing. |
| 175 | | |
| 176 | Q: | All right. [crosstalk] Is the home currently up for sale? |
| 177 | | |
| 178 | A: | No. |
| 179 | | |
| 180 | Q: | All right. Have you ever owned a home or condo that was not insured in the past or |
| 181 | | present? |
| 182 | | |
| 183 | A: | No. |
| 184 | | |
| 185 | Q: | All right. I know we normally ask about swimming pools and trampolines, um, but this |
| 186 | | company asks about, do you have a skateboard ramp or a treehouse? |
| 187 | | |
| 188 | A: | Six [sounds like], uh, like, uh, what does that mean? |
| 189 | | |
| 190 | Q: | Like a skateboard ramp or a treehouse? |
| 191 | | |
| 192 | A: | There are trees outside. |
| 193 | | |
| 194 | Q: | But do you have a treehouse up in the tree? |
| 195 | | |
| 196 | A: | No, no, no. I, I don't understand what's questioning there [sounds like]. |
| 197 | | |
| 198 | Q: | Like when you, when you build a treehouse up in a tree. Where it's like a playhouse |
| 199 | | where you can climb a ladder or climb a rope to get inside. . . |
| 200 | | |
| 201 | A: | No, no. |
| 202 | | |
| 203 | Q: | . . . and kids play in the treehouse. |
| 204 | | |
| 205 | A: | We only have a tree, but not, not a [inaudible] house. |
| 206 | | |

**Recorded Interview of:** Palwinder Singh
**Claim No.:** 2005979640
**Date Of Interview:** 1/3/2018
Page 6

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

| | | |
|---|---|---|
| 207 | Q: | OK. |
| 208 | | |
| 209 | A: | [inaudible] |
| 210 | | |
| 211 | Q: | Bear with me. |
| 212 | | |
| 213 | A: | Mm-hmm. [inaudible] the insurance. |
| 214 | | |
| 215 | Q: | And your, and your kitchen and your bathrooms, are, have they been customized? Or are |
| 216 | | they builder's grade? |
| 217 | | |
| 218 | A: | Um, [inaudible] builder's grade. |
| 219 | | |
| 220 | Q: | Builder's grade? |
| 221 | | |
| 222 | A: | Is it like a, like a customized, like, uh, they have a dinette [sounds like]? I don't have the |
| 223 | | name for that [sounds like]. . . |
| 224 | | |
| 225 | Q: | Uh, builder-, or customized means that you special ordered everything. So if something |
| 226 | | goes wrong in the kitchen and you have to replace it, they're gonna have to special order |
| 227 | | the items. The materials. |
| 228 | | |
| 229 | A: | Nah. It's just like that [sounds like], simple. |
| 230 | | |
| 231 | Q: | OK. So the system had you down as custom. Which is gonna, which is gonna offset the, |
| 232 | | um. . . |
| 233 | | |
| 234 | A: | The custom is good. |
| 235 | | |
| 236 | Q: | . . . rebuild cost. |
| 237 | | |
| 238 | A: | Custom is good. |
| 239 | | |
| 240 | Q: | Well, no, we don't want. . . |
| 241 | | |
| 242 | A: | Custom's good [sounds like]. . . |
| 243 | | |
| 244 | Q: | . . . to put it at custom if it's not custom. |
| 245 | | |
| 246 | A: | Well, it's, like, uh, you mean c-, uh, the kitchen is like, uh, we order them, they, they |
| 247 | | bring the cus-, kitchen, you know? That's the custom, right [sounds like]? It's not like a |
| 248 | | builder [sounds like]. |

**Recorded Interview of:** Palwinder Singh
**Claim No.:** 2005979640
Date Of Interview: 1/3/2018
Page 7

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

249
250  Q:   I'm sorry?
251
252  A:   It's customized, then. The kitchen is custom.
253
254  Q:   So you, it's a high-end kitchen? You special ordered everything that's in the kitchen right
255       now. You have. . .
256
257  A:   Yeah.
258
259  Q:   . . . solid wood cabinets. You have, um. . .
260
261  A:   Mm-hmm.
262
263  Q:   . . . subzero appliances?
264
265  A:   Yeah.
266
267  Q:   'Cause if there's a claim they're gonna wanna see proof of that, that, what you've
268       purchased, OK?
269
270  A:   Mm-hmm.
271
272  Q:   [pause] Bear with me.
273
274  A:   You still here [sounds like]?
275
276  Q:   Give me one second.
277
278  A:   Mm-hmm.
279
280  Q:   All right. And you said you escrow the insurance or do you pay it separate?
281
282  A:   No, uh, we, we, we go by monthly, you know, what happened, uh, then we go by the, uh,
283       my, my escrow called and we were doing it wrong. And, uh, we are doing something
284       like, uh, modification. So we, I have to [inaudible] my tax [sounds like] and it's fine.
285
286  Q:   OK. So it's not worked into your mortgage, then?
287
288  A:   No, no. We, we, we, we pay them [inaudible].
289
290  Q:   All right. And do you normally pay in full or do you do monthly installments?

**Recorded Interview of:** Palwinder Singh      [SP] = Spelling
**Claim No.:** 2005979640      [SS] = Speaking Simultaneously
Date Of Interview: 1/3/2018      [RD]= Recording Damage
Page 8

| | | |
|---|---|---|
| 291 | | |
| 292 | A: | Uh, I think my first [sounds like] installment then I can pay off the, few months I can |
| 293 | | pay, pay off, like up to six months I can pay fully. |
| 294 | | |
| 295 | Q: | All right. And did you find the mortgagee [sounds like] information? |
| 296 | | |
| 297 | A: | Yeah, I can, I can, I can, I can send, send, you, uh, tomorrow. |
| 298 | | |
| 299 | Q: | Mmmm, but we can't bind [sounds like] until we have it. Um, so right now. . . |
| 300 | | |
| 301 | A: | What do you need [crosstalk]. J-, j-, Bank of America. |
| 302 | | |
| 303 | Q: | I'm sorry? |
| 304 | | |
| 305 | A: | Bank of America. |
| 306 | | |
| 307 | Q: | If, it's a mortgagee clause. It's the name of your lender, the name, the address. . . |
| 308 | | |
| 309 | A: | Yeah. |
| 310 | | |
| 311 | Q: | . . . and your loan number. |
| 312 | | |
| 313 | A: | Yeah. Bank of, Bank of America. |
| 314 | | |
| 315 | Q: | Oh, Bank of America? [crosstalk] Hold on one second. |
| 316 | | |
| 317 | A: | Yeah. |
| 318 | | |
| 319 | Q: | Do you have the address? |
| 320 | | |
| 321 | A: | Yes, I do. |
| 322 | | |
| 323 | Q: | OK. |
| 324 | | |
| 325 | A: | It's Charlottesville I think [sounds like]. [inaudible] y-, w-, what you need [inaudible]? |
| 326 | | Just let me know and I can collect everything. Because I am not home right now. Yet |
| 327 | | [sounds like]. |
| 328 | | |
| 329 | Q: | They, it's called a mortgagee clause. So it's the name, it's the, they have a specific name. |
| 330 | | It's not, sometimes it's not Bank of America. Sometimes it's Bank of American NA or |
| 331 | | Bank of American LLC or ISA, um, ISAOA. Um, but there's. . . |
| 332 | | |

**Recorded Interview of:** Palwinder Singh  
**Claim No.:** 2005979640  
Date Of Interview: 1/3/2018  
Page 9

[SP] = Spelling  
[SS] = Speaking Simultaneously  
[RD]= Recording Damage

333   A:   OK. What, what [sounds like]. . .

334

335   Q:   . . . an address that they want, [crosstalk] it's called a document-. . .

336

337   A:   I think that they sell to other company.

338

339   Q:   I'm sorry?

340

341   A:   [inaudible] other company that [inaudible].

342

343   Q:   And I apologize. You're talking super-fast and I, I'm having a hard time following you. .

344       .

345

346   A:   Oh, OK [sounds like]. [laughs] [crosstalk]

347

348   Q:   . . . so if you look at your mortgagee certificate, or like your, uh, mortgage coupon. . .

349

350   A:   Yeah, I see what, what you're talking about. Let me see.

351

352   Q:   It's. . .

353

354   A:   It was Bank of America. . .

355

356   Q:   . . . usually on there.

357

358   A:   It was Bank of America before, then they sell, sell to somebody, what's the name. Just
359       like [sounds like] to the other people [sounds like], I think.

360

361   Q:   Like I said, if you look at your mortgagee certificate, it should be listed there.

362

363   A:   Yeah, no problem. When you asked it [sounds like], I was looking for [inaudible]. I put
364       F-A, the Bank of America, they sell to these people. F-A-Y. F like Frank, A for Apple
365       [sounds like] and Y for Yankees. Servicing. PO Box 619063, Dallas, Texas, 75261 dash
366       9063.

367

368   Q:   I'm sorry. So Dallas, Texas, 75261?

369

370   A:   Dash 9063.

371

372   Q:   9063. All right. And what is the loan number?

373

374   A:   Loan number, OK. [pause 12:30-13:48] Uh, 0000180892.

**Recorded Interview of:** Palwinder Singh
**Claim No.:** 2005979640
Date Of Interview: 1/3/2018
Page 10

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

375
376  Q:    All right. So I have 0000180892?
377
378  A:    Yes ma'am.
379
380  Q:    All right. Give me one second. Let me get that entered into the system. [pause] All right.
381        I just have to add in the loan number, bear with me.
382
383  A:    No problem at all. [pause] [inaudible]
384
385  Q:    And you already have a policy with Progressive? [crosstalk] For your auto?
386
387  A:    No ma'am. [sounds like] I would like to do that when we do that [sounds like]. After we
388        give you, like, after month, we can see how much we can [inaudible]. We have
389        [inaudible] so we can go with you guys later on.
390
391  Q:    All right. So then let me take that off 'cause I think the person that quoted you, um, didn't
392        put in the mortgagee information and, um, they gave you the multipolicy discount. So I
393        have to make sure that's correct and so bear with me.
394
395  A:    Mm-hmm.
396
397  Q:    All right. So I'm showing with the lender information added. . .
398
399  A:    Mm-hmm.
400
401  Q:    . . . um, taking out the multipolicy discount and making sure the last page of underwriting
402        questions is, is ran [sounds like], the rate that I have coming back for the year. . .
403
404  A:    Mm-hmm.
405
406  Q:    . . . is $2,591 even.
407
408  A:    OK. That's good. [sounds like]
409
410  Q:    OK. So let me just do a really quick coverage review.
411
412  A:    Uh, send me. . .
413
414  Q:    OK? [sounds like]
415

Recorded Interview of: Palwinder Singh
Claim No.: 2005979640
Date Of Interview: 1/3/2018
Page 11

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

416  A:    . . . an e-mail, OK? Send me an e-mail, I understand then [sounds like]. I think it's the
417        same, same thing, right? That other, other [sounds like] [inaudible].
418

419  Q:    I don't know because the premium, I don't, I couldn't see what the premium was prior.
420        But it's probably, um, different now because of, um, he didn't fill out the last page of
421        questions. . .
422

423  A:    I see [sounds like].
424

425  Q:    . . . plus he didn't have the mortgagee information in here. And he also gave you a
426        discount that was not supposed to be applied.
427

428  A:    OK. Yeah [sounds like].
429

430  Q:    I really, I really can't see what it was. But, I mean, if you took good notes, then you
431        might be able to tell. . .
432

433  A:    OK.
434

435  Q:    . . . if there's a difference or not.
436

437  A:    OK, ma'am. [sounds like]
438

439  Q:    All right. Give me one second. I apologize. Hold on one second. I think, I think it also put
440        in here that you're, you're billing your mortgagee company when you're not. So let me
441        see if I can get that corrected as well. Bear with me here.
442

443  A:    [crosstalk] maybe, maybe next month when I call them [sounds like] for [crosstalk]. . .
444

445  Q:    Yeah. Yeah, let me [crosstalk]. . .
446

447  A:    . . . we have. . .
448

449  Q:    Mm-hmm.
450

451  A:    . . . more, one more [sounds like] than my, my [inaudible]. I, I like the insurance
452        Progressive. It's not bad, bad, bad rate [sounds like]. Is it a good idea? So I be your
453        customer and you guarantee [sounds like] [inaudible]. And also with the house, you
454        know. Only a lot of people [sounds like] so that's what [inaudible].
455

**Recorded Interview of: Palwinder Singh**
**Claim No.: 2005979640**
Date Of Interview: 1/3/2018
Page 12

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

| | | |
|---|---|---|
| 456 | Q: | All right. Give me one second 'cause it was applied here that you were paying, that you |
| 457 | | were paying by mortgage company versus you paying it separate. So let me get that |
| 458 | | [crosstalk] corrected, let me get that corrected as well, OK? |
| 459 | | |
| 460 | A: | All right [sounds like]. |
| 461 | | |
| 462 | Q: | 'Cause that could change things. |
| 463 | | |
| 464 | A: | [inaudible] |
| 465 | | |
| 466 | Q: | [pause] All right. I apologize. So, yeah, so it had that you were mort-, that you were |
| 467 | | paying by mortgagee bill versus doing, which is a one-time payment versus installments. |
| 468 | | So that was different as well. So I am showing that the premium based on you doing |
| 469 | | installments. . . |
| 470 | | |
| 471 | A: | Mm-hmm. |
| 472 | | |
| 473 | Q: | . . . versus billing the mortgage company is $2,875 even. |
| 474 | | |
| 475 | A: | Two, uh, 2,000? |
| 476 | | |
| 477 | Q: | Yeah. $2,875 even. |
| 478 | | |
| 479 | A: | Before it was like $2500. |
| 480 | | |
| 481 | Q: | Yeah. That was based, you, if you had your company or you were billing your mortgage |
| 482 | | company. |
| 483 | | |
| 484 | A: | No. They told me 379 if you put a check [sounds like]. That's why they said [inaudible]. |
| 485 | | |
| 486 | Q: | As I said, the gentleman that you quoted, unfortunately he didn't do his job properly. He |
| 487 | | didn't fill out the last page of questions. Um, he didn't [crosstalk]. . . |
| 488 | | |
| 489 | A: | . . . how much, how much, [inaudible], how much is per month? |
| 490 | | |
| 491 | Q: | Per month? Uh, one second. Plus, yeah, I, like I said, also he gave you a discount for, for |
| 492 | | having auto [crosstalk] you don't have the auto with us. So if you do twelve installments, |
| 493 | | um, the one that's gonna give you the ten installmen-, or twelve pay-, or twelve months, |
| 494 | | ten payment plan, the first installment would be $431.32. And then you would have nine |
| 495 | | future installments of 279.52. |
| 496 | | |
| 497 | A: | 431, that's due today? |

**Recorded Interview of:** Palwinder Singh  
**Claim No.:** 2005979640  
Date Of Interview: 1/3/2018  
Page 13

[SP] = Spelling  
[SS] = Speaking Simultaneously  
[RD]= Recording Damage

498
499    Q:    That's if you do the ten installment plan. It's actually cheaper if you pay it full.
500
501    A:    I know that, but, you know, but you, you guys give me the full 25 and [sounds like]
502        [inaudible] [sounds like] and [inaudible] go up. Why did it go up? That's my question.
503
504    Q:    And that's what I tried to explain to you. The gentleman that quoted you, quoted you
505        incorrectly. He didn't complete the quoting process. He didn't fill out the last page. . .
506
507    A:    So why, why you keep this, why you guys keep this guy like that if he knows that he
508        quote has been wrong [sounds like]?
509
510    Q:    I don't know why he [crosstalk]. I'm not sure why he didn't finish out [crosstalk] the last
511        page.
512
513    A:    Not one guy, the other guy also said. . .
514
515    Q:    Yeah.
516
517    A:    . . . uh, maybe I'm telling you [sounds like] that this guy, he have approved of me
518        [sounds like].
519
520    Q:    And the, the other person must've not seen that they had gave you a discount that was not
521        supposed to be applied. So they were giving you a multipolicy discount. . .
522
523    A:    So [crosstalk]. . .
524
525    Q:    . . . for having auto, and you don't have auto with us.
526
527    A:    How about [sounds like], let me tell you [sounds like], I can respond if [sounds like] the,
528        the other, other [inaudible].
529
530    Q:    That I, I don't know. So did somebody already quote you the auto?
531
532    A:    Uh-huh. No, no, no. No, he didn't quote me. I just wondered, how much you discount
533        auto for? 1,000? 500?
534
535    Q:    I'm not sure how much it is. Hold on one second.
536
537    A:    Just approximate.
538

**Recorded Interview of:** Palwinder Singh             [SP] = Spelling
**Claim No.:** 2005979640                     [SS] = Speaking Simultaneously
Date Of Interview: 1/3/2018            [RD]= Recording Damage
Page 14

| | | |
|---|---|---|
| 539 | Q: | I don't have, I have to apply. I can't guess. I'm n-, I'm not gonna guess and give you |
| 540 | | wrong figures. So, because apparently. . . |
| 541 | | |
| 542 | A: | Well, how much i-, so my monthly, uh, will be 230 [sounds like] right now? |
| 543 | | |
| 544 | Q: | The first one is the 431.32 and the next one is [inaudible] 279.52 if you don't pay it off. |
| 545 | | |
| 546 | A: | And we went to 279, right? After that. |
| 547 | | |
| 548 | Q: | All right. [crosstalk] So let me see how much it would, let me see how much it would |
| 549 | | change if you had the auto policy with us as well. Give me one second. [pause] It would |
| 550 | | go down, um, of course there would still be a separate premium for the auto. But it would |
| 551 | | decrease the home policy by $140. |
| 552 | | |
| 553 | A: | That's nothing [sounds like]. [laughs] $140 is nothing. But 28.75 [sounds like], right? So |
| 554 | | I already was adding to that, the, uh, [inaudible]. That's OK. So, let me see what's going |
| 555 | | on. You guys not helping me. The [inaudible]. I, I call these guys. [inaudible] the other |
| 556 | | guys, but y-, what's your name, ma'am? |
| 557 | | |
| 558 | Q: | My name is Megan. |
| 559 | | |
| 560 | A: | Megan? And what is your position over there? |
| 561 | | |
| 562 | Q: | Um, I'm a senior customer service agent. |
| 563 | | |
| 564 | A: | Senior customer service agent. All right. And, uh, OK. I can pay you right now. And, uh, |
| 565 | | start the start today for me, OK? |
| 566 | | |
| 567 | Q: | OK. Hold on one second. Let me verify your e-mail address. I have P-V-I-R-K [sounds |
| 568 | | like] 100 at Gmail dot com? [pvirk100@gmail.com] |
| 569 | | |
| 570 | A: | Yes ma'am. |
| 571 | | |
| 572 | Q: | OK. |
| 573 | | |
| 574 | A: | That's my e-mail. |
| 575 | | |
| 576 | Q: | OK. [pause] All right. Making sure it's all applied. So what I'm gonna do is do a really |
| 577 | | quick coverage review, make sure you're still OK with everything there. |
| 578 | | |
| 579 | A: | Mm-hmm. Are y-, OK. Go ahead. |
| 580 | | |

581   Q:   Mm-hmm. So your dwelling is covered up to $816,070.

582

583   A:   Mm-hmm.

584

585   Q:   There is [inaudible] replacement cost built in up to additional 25 percent.

586

587   A:   OK.

588

589   Q:   Other structures, or anything not permanently attached to the home is $81,607.

590

591   A:   OK.

592

593   Q:   You have your personal belongings at $408,035.

594

595   A:   OK.

596

597   Q:   And that's based on personal property replacement costs. . .

598

599   A:   Mm-hmm.

600

601   Q:   . . . so if something happens to your belongings, you're going to get market value versus
602       depreciated value.

603

604   A:   OK.

605

606   Q:   You have loss of use, traditional living expense coverage, at $163,214.

607

608   A:   OK.

609

610   Q:   Personal liability is $500,000. Per current [sounds like] medical payments is $5,000 each
611       person.

612

613   A:   OK.

614

615   Q:   You do have loss assessment at $1,000. [inaudible] law is built in at 10 percent and you
616       do have water backup and sewage backup coverage at a $10,000 limit.

617

618   A:   OK.

619

620   Q:   And water backup has a $250 deductible. But for all other perils, all other claims, you
621       have a $1,000 deductible.

622

623     A:      How much is the deductible for the sewer, 250?
624

625     Q:      For water and sewage it's 250. But for all other perils, it's 1,000.
626

627     A:      OK. I got it.
628

629     Q:      OK?
630

631     A:      OK. Thank you so much, ma'am.
632

633     Q:      You're welcome. So on today's date, the 3rd, do you feel comfortable that the limits,
634             deductibles and coverages you're purchasing today will protect you and your assets
635             adequately?
636

637     A:      OK. No [sounds like]. [inaudible]
638

639     Q:      All right. So we'll make it to the last screen so I can take the payment.
640

641     A:      Mm-hmm. [pause]
642

643     Q:      All right. Bear with me here. All right, so, again, the total premium for the year is $2,875
644             even. Um, did you want to do that by debit card, credit card, or check?
645

646     A:      No, I, I, I say I, I want to pay right now. So [crosstalk]. . .
647

648     Q:      I, I'm sorry. I, you want to do what?
649

650     A:      I go by one, one, one [sounds like] [inaudible].
651

652     Q:      Yeah. We're, we're doing the one-time payment. But do you want to do that by debit
653             card, credit card, or check?
654

655     A:      Oh [sounds like]. Check.
656

657     Q:      Check? OK. And the account's in your name?
658

659     A:      Yes ma'am.
660

661     Q:      OK.
662

663     A:      [inaudible] Bank.
664

Allegis Transcript ID: 3167277

**Recorded Interview of:** Palwinder Singh
**Claim No.:** 2005979640
Date Of Interview: 1/3/2018
Page 17

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

| 665 | Q: | All right. Um, what is the routing number to the account? |
| 666 | | |
| 667 | A: | Mm-hmm. |
| 668 | | |
| 669 | Q: | All right. All right. Um, so we have them on here, we have Bank of America on here as |
| 670 | | your lender. So once the policy's active, we're gonna mail you documentation and we're |
| 671 | | gonna mail them documentation as well. So your, um, on today's date, the 3rd, you're |
| 672 | | authorizing, um. . . |
| 673 | | |
| 674 | A: | Yes ma'am. |
| 675 | | |
| 676 | Q: | . . . National General to withdraw the amount of the $431.32 from your checking account. |
| 677 | | . . |
| 678 | | |
| 679 | A: | Yes ma'am. [sounds like] |
| 680 | | |
| 681 | Q: | . . . and that's to start your policy effective today the 3rd. . . |
| 682 | | |
| 683 | A: | Mm-hmm. |
| 684 | | |
| 685 | Q: | . . . and of course your bills will be due every 3rd of the month. . . |
| 686 | | |
| 687 | A: | OK. |
| 688 | | |
| 689 | Q: | . . . your next one'll be due for the amount of the 279.52. But, of course, like you said, in |
| 690 | | six months, if you wanted to call back and pay off the balance, um, it'll just save you the |
| 691 | | installment fees at that point. . . |
| 692 | | |
| 693 | A: | OK. I got it [sounds like]. |
| 694 | | |
| 695 | Q: | . . . and you can just contact National General directly and, and pay through them. |
| 696 | | |
| 697 | A: | No problems. I got it [sounds like]. |
| 698 | | |
| 699 | Q: | All right .Did you happen to have any other questions before I bind the policy? |
| 700 | | |
| 701 | A: | No ma'am. Everything's fine. |
| 702 | | |
| 703 | Q: | All right. |
| 704 | | |
| 705 | A: | Please, uh, do [crosstalk]. And I have a month [inaudible] money. . . |
| 706 | | |

Recorded Interview of: Palwinder Singh
Claim No.: 2005979640
Date Of Interview: 1/3/2018
Page 18

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD] = Recording Damage

707 Q:     Uh-huh.
708
709 A:     . . . can you send me [inaudible], please? For that [sounds like] [crosstalk]. . .
710
711 Q:     Yes, um, unfortunately the proof is not available today. It has to go through the nightly
712        cycle. Uh, but once it issues tonight, um, they're gonna mail out paperwork to you
713        tomorrow. And they'll mail, um, the information out to Bank of America as well. So you
714        should have the paperwork probably in about three to five days, as far as the initial
715        paperwork.
716
717 A:     Uh, do you, do you have anything like that I can prove I have insurance today? Anything
718        [crosstalk]. . .
719
720 Q:     No, not that I, we have [sounds like], the only thing I'll be able to give you as
721        confirmation today is a policy number.
722
723 A:     Oh, yes. Yes, policy number. Just send me the e-mail of policy number.
724
725 Q:     Well, I won't have an e-mail I can send you with it. I have to verbally go over it with you
726        over the phone. Like I said, I won't have any do-, no documents will be available until
727        tomorrow. So if you want [crosstalk]. Yeah. To-, [crosstalk] now if you wanna call
728        National General, tomorrow, um [crosstalk] they should be able to print or e-mail you,
729        fax or e-mail you something right away. If you want to receive something before you
730        receive the hard copies in the mail.
731
732 A:     OK. [crosstalk]
733
734 Q:     We just won't unfortunately have anything today.
735
736 A:     That's, that's OK. You [inaudible] the, the, uh, number for that, I can show them [sounds
737        like] [crosstalk].
738
739 Q:     Let me give you the, the policy number first. . .
740
741 A:     OK.
742
743 Q:     . . . so, I'd like to thank you for choosing the Progressive Advantage Agency, which is
744        underwritten by National General. . .
745
746 A:     National. . .
747
748 Q:     . . . which is one of our, National General.

Recorded Interview of: Palwinder Singh
Claim No.: 2005979640
Date Of Interview: 1/3/2018
Page 19

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

| | | |
|---|---|---|
| 749 | | |
| 750 | A: | Uh-huh. |
| 751 | | |
| 752 | Q: | Which is one of our unaf-, unaffiliated carriers. |
| 753 | | |
| 754 | A: | What's that? |
| 755 | | |
| 756 | Q: | It's one of our unaffiliated carriers. So it's one of our partners that we use. |
| 757 | | |
| 758 | A: | [inaudible] OK. |
| 759 | | |
| 760 | Q: | The new policy is going to be effective today the 3rd. |
| 761 | | |
| 762 | A: | OK. |
| 763 | | |
| 764 | Q: | Of January, 2018. |
| 765 | | |
| 766 | A: | OK. |
| 767 | | |
| 768 | Q: | And the new policy number is going to be. . . |
| 769 | | |
| 770 | A: | Uh-huh. |
| 771 | | |
| 772 | Q: | . . .2005979640 dash 00. |
| 773 | | |
| 774 | A: | Uh-huh. OK, ma'am. OK. 2005979640 dash 00. |
| 775 | | |
| 776 | Q: | Yeah. And what I have to let you know is that National General. . . |
| 777 | | |
| 778 | A: | National General. |
| 779 | | |
| 780 | Q: | . . . they may want to do their own personal inspection. . . |
| 781 | | |
| 782 | A: | OK. |
| 783 | | |
| 784 | Q: | . . . if they choose to do one, it would normally be within the first two months. . . |
| 785 | | |
| 786 | A: | That's OK. |
| 787 | | |
| 788 | Q: | . . . and would be a federal inspection [crosstalk]. . . |
| 789 | | |
| 790 | A: | . . . gonna call me, somebody call me I can make an appointment with, with them. |

Allegis Transcript ID: 3167277

**Recorded Interview of: Palwinder Singh**
Claim No.: 2005979640
Date Of Interview: 1/3/2018
Page 20

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD]= Recording Damage

791
792  Q:   No. No, not for an inspection. They would just. . .
793
794  A:   Mm-hmm.
795
796  Q:   . . . they would, you know, come to the house. If they were going to do one, it would be
797       in the first two months. And they of course would knock on the door and let you know
798       they're there. But they would just walk the property and take pictures. Um, photo
799       inspection results could result in a change in premium. That's usually if we had the
800       square footage wrong, or the building materials incorrect.
801
802  A:   Uh-huh. [crosstalk]
803
804  Q:   And if there was a reason they wanted to do an internal inspection [crosstalk] OK?
805
806  A:   That's, that's not a problem. Just. . .
807
808  Q:   OK.
809
810  A:   . . . it's just be there [sounds like].
811
812  Q:   OK. Yeah. And if they wanted to do an internal inspection, they would contact you
813       separately to set up an appointment.
814
815  A:   OK.
816
817  Q:   OK?
818
819  A:   All right. Thank you.
820
821  Q:   Other than that, you are all set, unless you can think of any other questions that you have?
822
823  A:   [inaudible] what's the phone number for the, the National General [crosstalk]. . .
824
825  Q:   Sure. Give me one second.
826
827  A:   You know a good phone number [sounds like]. Every time I call to somebody [sounds
828       like]. [inaudible]
829
830  Q:   Bear, bear with me one moment. [pause] OK. Let's see. Their customer service number
831       is, um, 1-800-542-6792.
832

Allegis Transcript ID: 3167277

**Recorded Interview of:** Palwinder Singh
**Claim No.:** 2005979640
Date Of Interview: 1/3/2018
Page 21

[SP] = Spelling
[SS] = Speaking Simultaneously
[RD] = Recording Damage

833   A:   Uh-huh. OK. So I can call them tomorrow, they can send me the front page [sounds like]
834         for the insurance, right?
835

836   Q:   Yeah. Mm-hmm.
837

838   A:   So you have a confirmation number for the [inaudible] or everything's OK [sounds like]?
839

840   Q:   No, they don't give us one. Like I said, it had to have gone through. Um. . .
841

842   A:   OK. That's OK.
843

844   Q:   Because it gave me a policy number.
845

846   A:   Oh, then that's not, that's not a problem. That's not a problem. Thank you, ma'am. You
847         have a good day, ma'am.
848

849   Q:   You too. Take care.
850

851   A:   Bye.
852

853   Q:   Bye-bye.

,  . .

**RETURN TO After Recording**
AJAY PAL SINGH
4545-WHEELER ROAD APT. NO 206,
OXON HILL MARYLAND 20745

Consideration $.00
Tax Map No: 0131010028A
Deed Book/Page: 19848/0225 and 24377/1653-1656
Title Insurance Underwriter: Unknown to preparer
Prepared without benefit of Title Examination
Grantee Address:
4545- Wheeler Road Apt. No 206
Oxon Hill Maryland 20745

### 𝕲𝖎𝖋𝖙 𝕯𝖊𝖊𝖉

𝕿𝖍𝖎𝖘 𝕯𝖊𝖊𝖉 𝖔𝖋 𝕲𝖎𝖋𝖙 made this __29__ day of March 2019, by and between

Palwinder Singh Trustee of Palsata Trust, resident of 817 Walker Road Great Falls,
Virginia 22066 party of the first part ("Grantor" or "Donor"); and Ajay Pal Singh resident
of 4545- Wheeler Road Apt. No 206 Oxon Hill Maryland 20745, party of the second part
("Grantee" or "Donee"); wherein substitution of trustee or trustees is permitted,
and the trustee or trustees have the power to buy, sell and mortgage Trust
assets. The purpose in completing this document is to give effect to Palwinder
Singh's wishes regarding gifts he wishes to make during his lifetime to my brother Ajay
Pal Singh. To that end I , Palwinder Singh provide as follows:

I REVOKE all prior dispositions of every kind previously made by me respecting
the subject matter of this Deed of Gift, whether by a previous Deed of Gift or contained
in my Will.

### -𝖂𝖎𝖙𝖓𝖊𝖘𝖘𝖊𝖙𝖍 𝕿𝖍𝖆𝖙:

𝖂𝖍𝖊𝖗𝖊𝖆𝖘, 𝖎𝖓 𝖆𝖈𝖈𝖔𝖗𝖉𝖆𝖓𝖈𝖊 𝖜𝖎𝖙𝖍, Code of Virginia, § 58.1-811(D)
particularly § 58.1-811(A) 12 of Code of Virginia, 1950, as amended, as a transfer to a
revocable inter vivos trust, when the Grantors in the beneficiaries of the trust are the

1

PLAINTIFF'S EXHIBIT
tabbies*
F

same persons, regardless of whether other beneficiaries may also be named in the trust instrument, and also exempt from tax under § 58.1-810.3 as a conveyance between and the parties state that no consideration has passed between them and that the paper tax was paid on acquisition by the parties of the first part of the hereinafter described properties;

**As a Gift, and not for consideration**, the Grantor do hereby grant, bargain, sell and convey twenty (20) percent of Paisata 817 Walker Road Great Falls, Virginia 22066 share, in fee simple, with GENERAL WARRANTY and English Covenants of title, unto the Grantee, as sole owner all the following-described lot or parcel of land together with improvements thereon, situate, lying and being that property located at 817 Walker Road Great Falls, Virginia 22066 and also known and being more fully described as:

> PARCEL A, CONTAINING 2.00 ACRES, MORE OR LESS PROPERTY OF JOHN G. MOUNT AS THE SAME APPEARS DULY PLATTED AND RECORDED IN DEED BOOK NO. 3986 AND PAGE NO.495, OF THE LAND RECORDS OF FAIRFAX COUNTY.
> TOGETHER WITH THE RIGHT TO USE IN CONJUNCTION WITH OTHERS, AND SUBJECT TO A THIRTY FOOT (30) OUTLET EASEMENT AS SHOWN ON SAID PLAT, SAID OUTLETEASEMENT IS ONLY FOR THE USE OF PARCEL A AND B.
>
> Known as 817 Walker Road, Great Falls, VA 22066
>
> And BEING THE SAME PROPERTY CONVEYED UNTO THE GRANTORS, UNDER THE SUBSTITUTE TRUSTEE'S DEED DATED DECEMBER 17, 2007 AND RECORDED ON DECEMBER 19, 2007, IN DEED BOOK 19710 PAGE 623 AMONG THE AFORESAID LAND RECORDS.
>
> And BEING THE SAME PROPERTY CONVEYED UNTO THE GRANTORS, UNDER THE DEED OF GIFT DATED DECEMBER 01, 2015 AND RECORDED ON DECEMBER 01, 2015, IN DEED BOOK 24377 Pages 1653 to 1656. AMONG THE AFORESAID LAND RECORDS AS INSTRUMENT NO. 2015051170001
>
> WITH CURRENTLY HAS THE ADDRESS OF;
> For Information:
>
> 817 Walker Road Great Falls, Virginia 22066

2

This Deed is exempt from recordation taxes pursuant to Code of Virginia, § 58.1-811 (A) 12 as amended.

**AND BEING** the same property conveyed to the said grantor Palwinder Singh the Trustee of the Palsata Trust by the Deed recorded to Fairfax County Lands Record by instrument Number 2015051170001 recorded on December 01, 2015 in Book/Reel/Liber 24377 Pages 1653 to 1656.

**This conveyance** is made subject to the restrictions and conditions contained in the recorded documents forming the chain of title to this property. The said grantor doth covenant that he has the right to convey twenty percent of his share in the said property onto the said grantee(s) shall have quiet enjoyment, thereof; that the grantor has done no act to encumber said land; and the said grantors will execute such further assurances as may be requisite and necessary.

**The said Grantor** covenants that he has the right to convey twenty percent of his share in the said land to the said Grantee; that they have done no act to encumber the same; that the said Grantee shall have quiet possession of the said land, free from all encumbrances except mentioned herein; and that he, the said Grantor, will execute such further assurances of the land as may be requisite.

**Witness** the following signatures and seals.

_____ {SEAL}
**PALWINDER SINGH (Grantor)**

State of Virginia        )
County of Fairfax    ) to wit:

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, personally appeared Palwinder Singh and, who is personally known to me and has produced

3

. . - .

_Virginia Driver's License/ Customer Identification/Identifier Number T80815819_ as identification, and who executed the foregoing instrument and acknowledged before me that he executed the same in the presence of witnesses my hand and official seal in the County and State last aforesaid this 25 Day of March, 2019

NOTARYPUBLIC

My commission expires: 12/31/22



## ACKNOWLEDGEMENT BY GRANTEE

I, AJAY PAL SINGH, acknowledge, foregoing deed on 25 Day of March 2019

𝔚𝔦𝔱𝔫𝔢𝔰𝔰 the following signatures and seals.

{SEAL}

AJAY  PAL  SINGH  (Grantee)

State of Virginia        )
County of Fairfax      ) to wit:

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, personally appeared AJAY PAL SINGH and, who is personally known to me   and has produced _Maryland Driver's License Number/ Customer Identifier Number S-520-037-676-406,_ as identification, and who executed the foregoing instrument and acknowledged before me that he executed the same in the presence of witnesses my hand and official seal in the County and State last aforesaid this 29 Day of March, 2019

NOTARYPUBLIC

My commission expires 12/31/22

4

04/01/2019

Eastern District of Virginia - LIVE

**15-10856-RGM** Palwinder Singh
**Case type:** bk **Chapter:** 13 **Asset:** Yes **Vol:** v **Judge:** Robert G. Mayer
**Date filed:** 03/13/2015 **Date of last filing:** 11/30/2015
**Debtor dismissed:** 09/23/2015
**Date terminated:** 10/14/2015

# Case Summary

**Office:** Alexandria                                          **Filed:** 03/13/2015
**County:** FAIRFAX-VA                              **Terminated:** 10/14/2015
**Fee:** Paid                                    **Debtor discharged:**
**Origin:** 0                                              **Reopened:**
**Previous term:**                                         **Converted:**
                                            **Debtor dismissed:** 09/23/2015
**Joint:** n                                    **Confirmation hearing:**
**Original chapter:** 13
**Current chapter:** 13

**Debtor disposition:** Dismissed for Other Reason

**Nature of debt:** consumer
**Pending status:** Case Closed
**Flags:** DISMISSED, CLOSED

**Trustee:** Thomas P. Gorman **City:** Alexandria **Phone:** (703) 836-2226 **Email:** ch13alex@gmail.com

**Party 1:** Singh, Palwinder (Debtor)
     SSN / ITIN: xxx-xx-6812

**Atty:** Nathan A. Fisher     **Represents party 1:** Debtor          **Phone:** (703) 691-1642
                                                              **Fax:** (703) 691-0192
                                                            **Email:** Fbarsad@cs.com

**Location of case files:**
  **Volume:** 1
The case file may not be available.

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/10/2020 15:37:36 | | | |
| **PACER Login:** | sl2437:3196554:0 | Client Code: | |
| **Description:** | Case Summary | Search Criteria: | 15-10856-RGM |
| **Billable Pages:** | 1 | Cost: | 0.10 |

**PLAINTIFF'S EXHIBIT**
tabbies
6

1/1

Case 1:21-cv-00207-TDS-JEP   Document 7-1   Filed 04/06/21   Page 97 of 100

**16-10804-KHK** Palwinder Singh
Case type: bk Chapter: 13 Asset: Yes Vol: v Judge: Klinette H. Kindred
Date filed: 03/07/2016 Date of last filing: 04/20/2018
Debtor dismissed: 02/28/2017
Date terminated: 09/19/2017

# Case Summary

Office: Alexandria
County: FAIRFAX-VA
Fee: Installment
Origin: 0
Previous term:

Joint: n
Original chapter: 13
Current chapter: 13

Filed: 03/07/2016
Terminated: 09/19/2017
Debtor discharged:
Reopened:
Converted:
Debtor dismissed: 02/28/2017
Confirmation hearing:

Debtor disposition: Dismissed for Other Reason

Nature of debt: consumer
Pending status: Case Closed
Flags: CLOSED, DISMISSED

Trustee: Thomas P. Gorman   City: Alexandria   Phone: (703) 836-2226   Email: ch13alex@gmail.com

Party 1: Singh, Palwinder   (Debtor)
     SSN / ITIN: xxx-xx-6812

Location of case files:
   Volume:   1
The case file may not be available.

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 08/10/2020 15:39:46 | | |
| PACER Login: | si2437:3196554:0 | Client Code: | |
| Description: | Case Summary | Search Criteria: | 16-10804-KHK |
| Billable Pages: | 1 | Cost: | 0.10 |

Eastern District of Virginia - LIVE

**17-12173-BFK** Palwinder Singh
Case type: bk Chapter: 11 Asset: Yes Vol: v Judge: Brian F. Kenney
Date filed: 06/26/2017 Date of last filing: 02/05/2019
**Debtor dismissed: 05/16/2018**
**Date terminated: 02/05/2019**

# Case Summary

| | |
|---|---|
| **Office:** Alexandria | **Filed:** 06/26/2017 |
| **County:** FAIRFAX-VA | **Terminated:** 02/05/2019 |
| **Fee:** Installment | **Debtor discharged:** |
| **Origin:** 0 | **Reopened:** |
| **Previous term:** | **Converted:** |
| | **Debtor dismissed:** 05/16/2018 |
| **Joint:** n | **Confirmation hearing:** |
| **Original chapter:** 11 | |
| **Current chapter:** 11 | |

**Debtor disposition:** Dismissed for Other Reason

**Nature of debt:** consumer
**Pending status:** Case Closed
**Flags:** DISMISSED, BARDEBTOR, CLOSED

**Trustee:** John P. Fitzgerald, III   **City:** Alexandria   **Phone:** 703-557-7176   **Email:** ustpregion04.ax.ecf@usdoj.gov

**Trustee:** Judy A. Robbins   **City:** Alexandria   **Phone:** 703-557-7176   **Email:** ustpregion04.ax.ecf@usdoj.gov

**Party 1:** Singh, Palwinder   (Debtor)
    SSN / ITIN: xxx-xx-6812

**Location of case files:**
   **Volume:** 1
The case file may not be available.

---

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/10/2020 15:41:06 | | |
| **PACER Login:** st2437:3196554:0 | **Client Code:** | |
| **Description:** Case Summary | **Search Criteria:** 17-12173-BFK |
| **Billable Pages:** 1 | **Cost:** 0.10 |

PREPARED BY & RETURN TO:
C. R. Hall
2860 Exchange Blvd. # 100
Southlake, TX 76092
Parcel # 013-1--01--0028-A_Y      **Assignment of Deed of Trust**      Send Any Notices To Assignee.

For Valuable Consideration, the undersigned, **BANK OF AMERICA, N.A. 1800 Tapo Canyon Rd, Simi Valley, CA 93063** (Assignor) by these presents does assign, and set over, without recourse, to **WILMINGTON TRUST, NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR MFRA TRUST 2014-2** c/o MFResidential Assets I, LLC, 350 Park Avenue, 20th Floor, New York, NY 10022 (Assignee) the described mortgage/deed of trust with all interest, all liens, any rights due or to become due thereon, executed by **PALWINDER SINGH, HUSBAND** to BANK OF AMERICA, N.A. and PRLAP, INC., as trustee. Said mortgage/deed of trust Dated: **3/18/2008** is recorded in the State of VA, County of Fairfax on 3/25/2008, as Book 19848 Page 0228 Instrument 2008007659.003 AMOUNT: $ 842,080.00 Trustee(s): PRLAP, INC. Property Address: 817 WALKER ROAD, GREAT FALLS, VA 22066

SINGH   DBD  *17119458*

IN WITNESS WHEREOF, the undersigned entity has caused this instrument to be executed by its proper signatory. Executed on: October 17, 2017
BANK OF AMERICA, N.A. By Orion Financial Group, Inc. Its Attorney in fact

By: _____            _____

Connie M. Riggsby, Vice President          Attest:  J. Renteria

POWER OF ATTORNEY IS BEING RECORDED SIMULTANEOUSLY HEREWITH

VA Fairfax

870221373
MFA/BOA2017-5/SFR

